Vera HUTSON, Plaintiff-Appellant,

v.

STATE of Wisconsin PERSONNEL COMMISSION,
Defendant-Respondent.†

Court of Appeals

*No. 01–2959. Oral argument July 17, 2002.—Decided
September 10, 2002.*

## 2002 WI App 249

(Also reported in 654 N.W.2d 465.)

† Petition to review granted 12-10-02.

On behalf of the plaintiff-appellant, the cause was submitted on the brief of *Alan C. Olson*, of *Alan C. Olson & Associates, S.C.*, of New Berlin. There was oral argument by *Alan C. Olson*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *David C. Rice*, assistant attorney general. There was oral argument by *David C. Rice*.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. Vera Hutson, a probation and parole agent for the Wisconsin Department of Corrections (DOC), appeals from the circuit court order affirming a decision of the Wisconsin Personnel Commission dismissing her unlawful retaliation claim against

DOC, under the Wisconsin Employee Protection Act (Subchapter III of Chapter 230, the Wisconsin State Employment Relations Act), commonly known as the "Whistleblower Law."[1] The Commission, following a five-day hearing, determined that Hutson's memo to her supervisor, advising him of her caseload concerns, was not a disclosure of information protected under WIS. STAT. § 230.80 (1995–96) of the Whistleblower Law.[2] The Commission concluded, therefore, that it need not address Hutson's allegation that DOC unlawfully retaliated against her when it reprimanded her within six months after she wrote the memo.

¶ 2. Hutson argues that the Commission erred in concluding that her memo was not a disclosure of information protected under the Whistleblower Law. She is correct and, accordingly, this court reverses and remands for the Commission's consideration of Hutson's unlawful retaliation claim.[3]

---

[1] Subchapter III of ch. 230, entitled "Employe[e] Protection," was created by 1983 Wis. Act 409, § 9, effective May 11, 1984. Part of the purpose of the act was to encourage "employe[e] disclosure of improper activities in governmental units and [to prohibit] retaliation because of such disclosure." Preamble to 1983 Wis. Act 409; 1983 A.B. 240.

[2] All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

[3] Hutson also challenges the Commission's conclusion under the Whistleblower Law on several other bases. Because her primary argument is dispositive, we need not address her other theories. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive argument need be addressed).

The Commission also found that Hutson had engaged in activity protected by WIS. STAT. § 111.321, the Wisconsin Fair Employment Act (WFEA), but that DOC had submitted sufficient evidence establishing a "reasonable basis" for reprimand-

## I. BACKGROUND

¶ 3. The Commission provided a fifty-page decision and order detailing many aspects of this case that may prove important following remand. Here, however, we briefly recount only those findings, undisputed on appeal, that help to clarify the context of the case and define the dispositive issue in this appeal.

¶ 4. Hutson began her employment as a DOC probation and parole agent in 1990. As an agent, she was responsible for monitoring offenders placed on probation or parole through Wisconsin's criminal jus-

---

ing her, thus defeating her *prima facie* retaliation case under the WFEA. On appeal, Hutson does not challenge the Commission's conclusion under the WFEA. The Commission, therefore, suggests that if we conclude that it erred in determining that Hutson's memo was not a protected disclosure under the Whistleblower Law, we should affirm by grafting its "reasonable basis" finding under the WFEA to Hutson's whistleblower claim.

We decline to do so. As Hutson correctly argues, the Wisconsin Employee Protection Law provides a presumption that disciplinary action occurring within two years from the date of an employee's protected activity is retaliatory. WISCONSIN STAT. § 230.85(6)(a) states:

> If a disciplinary action occurs or is threatened within the time prescribed under par. (b), that disciplinary action or threat is presumed to be a retaliatory action or threat thereof. The respondent may rebut that presumption by a preponderance of the evidence that the disciplinary action or threat was not a retaliatory action or threat thereof.

The WFEA provides no such presumption. Thus, because the Commission did not deem Hutson's memo to be a protected disclosure under the Whistleblower Law, it never reached the question of retaliation and never viewed the evidence through the legal lens the presumption provides. The Commission now will have the opportunity to do so.

905

tice system.[4] Her caseload, like that of other agents, was "calculated by using a point system designed to reflect the amount of time spent by the agent supervising offenders." For the period relevant to this case, a "memo of understanding" between DOC and Hutson's union provided for a caseload maximum of 260 points. The point system, however, "did not include a category for cases in which the agent did not meet with the offender on a scheduled basis."

¶ 5. In October 1995, Hutson was assigned to Unit 033, the Milwaukee office of a new "administrative minimum" program designed to work with a private vendor to provide telephone-monitoring of thousands of clients classified as low-risk offenders. In that assignment, Hutson reported to her supervisor, James Wake. Wake reported to Kathleen Ware, one of three deputy chiefs for the Milwaukee district, and Ware reported to Allan Kasprzak, chief of the Milwaukee region.

¶ 6. On February 5, 1996, Hutson wrote a memo, "Re: Workload Relief," to Wake, with copies to Ware and two union officials. The memo stated:

---

[4] In its findings, the Commission quoted the position description for DOC probation and parole agents. Because, as we will explain, that description supports Hutson's argument that her memo to her supervisor was a protected disclosure, we quote certain salient portions:

> Under the general direction of the supervisor, this position is responsible for the provision of services to protect the public by holding offenders accountable for their behavior, the preparation of case plans for offenders; fostering law abiding behavior and positive participation of individual offenders in the community; the preparation of accurate and timely investigation, reports, and case records; community outreach activities, liaison activities and other special assignments as required . . . . The work at this level is highly responsible and is performed independently utilizing professional judgment and includes accountability for actions.

I am writing this correspondence to request workload relief and/or authorized overtime of one hour per every 5.5 points over the 260 point caseload cap per our union contractual agreement for the 1995–1997 contract year. I am currently supervising a total of 559 cases[,] 475 under my agent number and 84 for a co-worker who will be out on sick leave for the next four to seven weeks. I am 319 points above the 260 maximum caseload cap. According to the Department of Corrections manual CC/SD standards[,] cases classified as minimum are weighted as one point per case. I am aware of the fact that some specialized units are excluded from the 260 point caseload cap maximum. However, the exclusion only takes effect after a mutual agreement is reached between the Secretary of the Department of Corrections, the Regional Chief(s), D[OC] Employment Relations, AFSCME Council 24 and the local union. To my knowledge that has not occurred. Therefore, I am fully covered under the 1995–1997 contract and the agreement of a 260 workload cap maximum.

Due to the excessive workload and a caseload that continues to grow without a foreseeable end, coupled with the lack of clarity under a supervisory style that is extremely arbitrary and capricious[,] I have found the work environment to be highly stressful and terribly distracting to try to manage my caseload adequately and professionally. I am at this time requesting that reasonable guidelines be established that would enable me to perform my job to best meet the needs of the protection of the community, the Department of Corrections and myself as agent in the Minimum/Administrative unit.

Your response will be appreciated;

Sincerely,

Vera Hutson[5]

(Footnote added.) According to the Commission's find-

[5] Here, we have quoted the entire text of the memo, as entered as an exhibit at the Commission hearing, not as quoted,

ings, "[t]wo other agents in Unit 033, Vicki Turner and Michelle McKinstry, were also understood to support the memo."

¶ 7. In a February 9, 1996 memo to Hutson, with a copy to Ware, Wake responded by scheduling a February 20 meeting to discuss Hutson's concerns. Hutson replied with a memo reminding Wake and Ware that, a few weeks earlier, she had been assigned to be in Beloit to enroll clients in the unit. Wake promptly replied, offering to reschedule the meeting.

¶ 8. In the meantime, however, on February 19, Hutson and Wake had a "heated argument" involving a court hearing and related matters. Wake then took several steps. He contacted two of Hutson's previous supervisors for information about their experiences with her; filed a complaint with DOC's Affirmative Action office alleging Hutson was harassing him and creating a hostile environment; began to maintain a file documenting his interactions with Hutson; restricted his contact with Hutson to communications in writing or conversations in the presence of witnesses; and he directed Hutson "to review a list of [Milwaukee] Region . . . cases 'without files' and take certain actions by March 1st."

¶ 9. On February 29, Wake and Ware met with Hutson regarding her memo; they also met with McKinstry and Turner.[6] At the meeting with Hutson, Ware

---

in part, in the Commission's decision. As we will explain, we attach some significance to the Commission's deletion of certain portions of the memo from its decision.

[6] The Commission's findings do not clarify whether Wake and Ware were together when they met with McKinstry and/or Turner, or whether McKinstry and Turner were together when they met with Wake and/or Ware. The findings also do not

908

"explained that Unit 033 was not subject to the memo of understanding between the agents' union and management, regarding caseload." Thus, on March 5, Ware wrote a memo to Hutson, McKinstry, and Turner, stating:

> As Supervisor James Wake and I have concluded meeting with each of you regarding your request for workload relief[,] I want to advise you that no formal action to reassign workload or reduce the number of cases assigned will be taken at this time. The reasons for this action are as follows:
>
> - No point classification is assigned to cases within the unit at this time. As you were advised, the legislature removed workload credit for minimum/administrative from the CC/SD system effective Jan. 1, 1996.
>
> - In your request you indicated that per manual chapter 02.03.01–.02[,] cases at minimum are assigned 1 point. As you were advised, you are not required to meet the manual standards of face to face contact or home visits[,] as appropriate[,] which based on a time study generated 1 point.
>
> - At present the unit does not have an exemption to the memorandum of understanding; however, the process has been started.
>
> Both Jim and I continue to remain open to your feedback and to specific suggestions you may have regarding making the work environment more productive and to increase the efficiency of the Unit. I look

clarify whether Hutson was at any such meeting or meetings when Wake and/or Ware met with McKinstry and/or Turner.

forward to your ideas for duties which a Program Assistant can assume to assist you in managing your workload.

¶ 10. On March 13, 1996, Wake convened a meeting "related to procedures and practices as well as issues within the unit." When, however, Hutson told Wake, "You are treating us like slaves," Wake "abruptly terminated the meeting."

¶ 11. On March 15, 1996, Hutson wrote a memo to Milwaukee Region Chief Kasprzak, with copies to Wake, Ware, and a union representative, stating that it seemed "no one [was] willing to listen" to the agents' concerns about Wake and the need for workload relief, and expressing additional concern about the agents' "personal safety" in light of Wake's anger. Kasprzak promptly responded by scheduling a March 19 meeting for members of his management team, Wake, Hutson, McKinstry, Turner, and the agents' union representative, to meet with him.

¶ 12. On March 19, three meetings relating to Hutson's concerns took place. Wake, Ware, and Kasprzak attended the third meeting and, according to the Commission, "Mr. Wake made contemporaneous notes" that "accurately describe Mr. Kasprzak's comments." Those notes stated, in part, that Kasprzak, referring to Hutson, McKinstry, and Turner, said:

- "The strategy is to separate them (the trouble makers) and grind them down one by one[.],"

- "The way to beat a bully is to beat him senseless."

- "I just ignore harassment complaints against me. The Dept[.] will ride it out and the complainant will be bought off and the reward to them (complain-

910

ant[)] is piddly[]. They gave [an agent] $7000. After attorney fees she got nothing."

- "This is all part of being a manager."

("[an agent]" in Commission findings; all other alterations added.)[7]

¶ 13. Following the March 19 meetings, Kasprzak wrote an "Outcomes" memo stating the six steps to be taken to address the agents' concerns, including: "Obtain an authoritative statement on whether caseload classification still applies to administrative/minimum cases ([Allan Kasprzak:] check w/ legal counsel or leg. liaison)"; and, "Foster a unit atmosphere of mutual respect in a harassment[-]free environment (All pledge to work on this)."

¶ 14. On March 29, Hutson spoke with DOC Secretary Michael Sullivan about her concerns. Then, on April 19, 1996, exactly one month after the March 19 meetings, Ware directed Hutson to report for an investigatory interview because of her alleged violation of

---

[7] Additionally, according to the Commission's findings:

> Ms. Ware was shocked by Mr. Kasprzak's comments. She told Mr. Wake that she was very offended by the comments. Mr. Wake reported Mr. Kasprzak's comments to Eurial Jordan[, DOC Division Administrator for Community Corrections,] on two occasions. Mr. Jordan understood the comments referred to [Hutson], Ms. Turner and Ms. McKinstry. Mr. Jordan later spoke with Mr. Kasprzak and told him the comments at the March 19th meeting with Mr. Wake and Ms. Ware were inappropriate. Mr. Jordan was aware of Mr. Kasprzak's March 19th comments at the time Mr. Kasprzak was recommending that a disciplinary investigation be conducted of [Hutson].

(Citations omitted.) In fact, at the Commission hearing, Wake testified that he considered Kasprzak's comments so offensive that he filed an affirmative action complaint against him.

work rules involving harassment and use of inappropriate language with offenders. Three days later, Hutson wrote Secretary Sullivan seeking his "assistance in dealing with these issues" involving Wake, Ware, and the workload.

¶ 15. On June 6, 1996, Hutson filed her complaint against DOC with the Commission. She alleged unlawful discrimination based on race and military status, unlawful retaliation under the WFEA, and unlawful retaliation under the Whistleblower Law.

¶ 16. On June 10, 1996, Hutson (as well as McKinstry, Turner, and another agent) transferred out of Unit 033 and, on August 19, 1996, following various disciplinary proceedings, DOC issued a written reprimand citing Hutson for various work-rule violations, including insubordination, disobedience, negligence, and harassment. Hutson appealed her reprimand under her contractual grievance procedure and, at arbitration, the reprimand was upheld.

¶ 17. In May and June 1999, the Commission conducted a five-day hearing on Hutson's complaint and, more than one year later, on August 28, 2000, the Commission issued its Decision and Order dismissing Hutson's action against DOC. Hutson then sought circuit court review of the Commission's decision, *see* Wis. Stat. §§ 227.52–227.57, and, on September 20, 2001, the circuit court affirmed, leading to this appeal, *see* Wis. Stat. § 227.58. Here, only the Commission's dismissal of Hutson's whistleblower claim is at issue.

## II. DISCUSSION

### A. Standard of Review

¶ 18. On an appeal from a circuit court's order affirming or reversing an administrative agency's deci-

sion, we review the decision of the agency, not that of the circuit court. *Barnes v. DNR*, 178 Wis. 2d 290, 302, 506 N.W.2d 155 (Ct. App. 1993). We do not substitute our judgment for that of the Commission, as to the weight of the evidence or credibility of witnesses. *See Kannenberg v. LIRC*, 213 Wis. 2d 373, 384, 571 N.W.2d 165 (Ct. App. 1997); Wis. Stat. § 227.57(6). Whether the Commission properly interpreted a statute, however, presents a question of law; we are not bound by the Commission's interpretation. *See Kannenberg*, 213 Wis. 2d at 384; § 227.57(5).

¶ 19. In this appeal, no factual finding is in question. The issue, simply, is whether Hutson's February 5 memo is a protected disclosure under Wisconsin's Whistleblower Law.[8] As we will explain, resolution of

---

[8] The parties debate whether the Commission should have considered written and oral communications that occurred subsequent to the February 5 memo in determining whether the memo was a protected disclosure of information.

Hutson argues that the Commission should not have limited its analysis to the February 5 memo and, instead, should also have considered at least one February 29 meeting and her March 15 memo to Kasprzak. According to the Commission, however, Hutson, in her post-hearing brief, "identified the 'work relief memo' of February 5, 1996, as her protected activity under the Whistleblower Law." Hutson has offered nothing to rebut the Commission's statement.

At oral argument before this court, the Commission acknowledged that although the focus of a whistleblower action must be the written disclosure triggering potential protection, *see* Wis. Stat. § 230.81(1)(a), the determination of whether the written communication conveyed protected "information" under Wis. Stat. § 230.80(5) could depend on subsequent communications, written or even oral. The Commission's concession on this point makes sense. Consider, for example, that an employee

that issue required the Commission to determine whether the memo disclosed "information," as defined by WIS. STAT. § 230.80(5), which further required the Commission to determine whether the memo described "mismanagement," as defined by § 230.80(7).

¶ 20. Thus, we are presented with a purely legal issue involving the Commission's interpretation of the statutes. Nevertheless, we defer to an agency's statutory interpretations in certain situations. *Kannenberg*, 213 Wis. 2d at 384–85. As we have explained:

> We give great weight when:
>
>> (1) the agency was charged by the legislature with the duty of administering the statute; (2) . . . the interpretation of the agency is one of long-standing; (3) . . . the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) . . . the agency's interpretation will provide uniformity and consistency in the application of the statute.
>
> We also give great weight to an agency's interpretation if it is intertwined with factual determinations or with value or policy determinations. We give a lesser amount

might provide a written memo to his or her supervisor, as required under § 230.81(1)(a), but the supervisor might first follow-up, perhaps informally and orally, by asking the employee for clarification of the stated concern. Certainly, a fair determination of whether the memo qualified as one disclosing "information" under § 230.80(5) should not foreclose consideration of that follow-up conversation. *See, e.g., State v. Sharp*, 180 Wis. 2d 640, 656, 511 N.W.2d 316 (Ct. App. 1993) (rule of completeness may call for introduction of additional statements to provide context of admitted statement).

In this case, however, we need not consider any subsequent communications because, we conclude, the February 5 memo, standing alone, qualified as a protected disclosure of information.

of deference—due weight—when the agency has some experience in the area but has not developed the expertise that necessarily places it in a better position than the court to make judgments regarding the interpretation of the statute.

Under the great weight standard, we uphold an agency's reasonable interpretation of the statute if it is not contrary to the clear meaning of the statute, even if we conclude another interpretation is more reasonable. However, under the due weight standard, we uphold the agency's reasonable interpretation if it comports with the purpose of the statute and we conclude there is not a more reasonable interpretation.

*Id.* at 385 (citations omitted).

¶ 21. In this case, the Commission argues that its decision is entitled to great weight, while Hutson suggests that the decision may be entitled to "no special deference" given that "this court is as competent as the administrative agency to decide the legal question involved." We conclude, however, that the Commission's decision deserves due weight (though we hasten to add that our resolution of this appeal would be the same even under the great-weight standard).

¶ 22. In its lengthy decision, the Commission devoted three pages to a discussion of whether Hutson's memo was a protected disclosure under the Whistleblower Law. The Commission cited no case law addressing a similar issue (and indeed, on appeal, the parties have not cited a single case to which the Commission could have turned for clear guidance), and only one of its own administrative decisions, issued March 14, 1997, dealing with a comparable question.

■

¶ 23. Thus, while the Commission clearly has the duty to administer the Whistleblower Law, *see* WIS.

STAT. §§ 230.03(8) & 230.89, its interpretation of the statutes in question is not "of long-standing," and its "expertise or specialized knowledge in forming the interpretation" still appears to be in the formative stage, *see Kannenberg*, 213 Wis. 2d at 385 (citations omitted). Thus, the situation here seems to be of the kind we anticipated when explaining that due deference is appropriate "when the agency has some experience in the area but has not developed the expertise that necessarily places it in a better position than the court to make judgments regarding the interpretation of the statute." *Id.*

## B. The Statutes

¶ 24. Wisconsin's Whistleblower Law is part of Chapter 230, the Wisconsin State Employment Relations Act. The Statement of Policy of the Act provides, in part, "It is the purpose of this chapter to provide state agencies . . . with competent personnel who will furnish state services to citizens as fairly, efficiently and effectively as possible." WIS. STAT. § 230.01(1). The Statement of Policy also provides, "It is the policy of this state to encourage disclosure of information under subch. III and to ensure that any employe[e] employed by a governmental unit is protected from retaliatory action for disclosing information under subch. III." WIS. STAT. § 230.01(2).

¶ 25. Subchapter III, entitled "Employe[e] Protection," provides the statutory framework under which governmental employees may gain protection against retaliation for making certain disclosures of information under certain circumstances. As relevant to the circumstances of the instant case, WIS. STAT. § 230.81 provides:

**Employe[e] disclosure. (1)** An employe[e] with

knowledge of information the disclosure of which is not expressly prohibited by state or federal law, rule or regulation may disclose that information to any other person. However, to obtain protection under s. 230.83, before disclosing that information to any person other than his or her attorney, collective bargaining representative or legislator, the employe[e] shall do . . . the following:

(a) Disclose the information in writing to the employe[e]'s supervisor.

¶ 26. WISCONSIN STAT. § 230.80(5) defines "information":

"Information" means information gained by the employe[e] which the employe[e] reasonably believes demonstrates:

(a) A violation of any state or federal law, rule or regulation.

(b) Mismanagement or abuse of authority in state or local government, a substantial waste of public funds or a danger to public health and safety.

In this case, the parties agree that Hutson's memo, if protected at all, complained of "[m]ismanagement" under WIS. STAT. § 230.80(5)(b). WISCONSIN STAT. § 230.80(7) defines "mismanagement":

"Mismanagement" means a pattern of incompetent management actions which are wrongful, negligent or arbitrary and capricious and which adversely affect the efficient accomplishment of an agency function. "Mismanagement" does not mean the mere failure to act in accordance with a particular opinion regarding management techniques.

917

## C. The Commission's Decision

¶ 27. The Commission concluded that Hutson's February 5, 1996 memo failed to state a claim under the Whistleblower Law because it did not describe "a pattern of incompetent management," under WIS. STAT. § 230.80(7) and, therefore, did not qualify as a protected disclosure of "information" under WIS. STAT. § 230.80(5)(b). The Commission explained, in relevant part:

> Complainant's comments about an "arbitrary and capricious" supervisory style and the lack of "reasonable guidelines" are too general and conclusory to satisfy the statutory requirement for making a disclosure of "information." Complainant's statements could relate to the general concept of "mismanagement" that is defined in [WIS. STAT.] § 230.80(7), but it is impossible to say that these references in her February 5th memo describe mismanagement. Therefore, complainant's references to the style of supervision and to a lack of guidelines do not satisfy the requirements for a protected whistleblower disclosure.
>
> The second topic of complainant's February 5th memo is her allegation that she has an excessive workload. The record raises significant questions about whether it was reasonable to conclude that the workload was excessive . . . .
>
> Even though there is significant evidence suggesting it would have been unreasonable to believe complainant's caseload was excessive, agents McKinstry and Turner shared complainant's opinion. Without deciding this point, *the Commission will assume that complainant has been able to meet her burden of showing hers was a "reasonable belief" that the caseload assigned her was excessive and, as a consequence, a wrongful and negligent management action.*

> *Even assuming complainant has met the "reason-*
> *able belief" standard and that establishing a workload*
> *level is a wrongful management action that is not a*
> *"management technique," complainant's disclosure did*
> *not describe a "pattern of incompetent management*
> *actions" as required in the definition of "management."*
> *This language reflects a clear legislative intent to pro-*
> *vide the protections of the Whistleblower Law to only*
> *those employe[e]s who identify a **series** of incompetent*
> *management actions, i.e. more than an isolated instance*
> *of alleged mismanagement.* Complainant's reference to
> an excessive workload is not a protected disclosure of
> "information."

(Footnotes omitted; *"series"* italicized in Commission's
decision; other emphases added.)[9]

---

[9] In support of its rationale, the Commission relied on its
decision in *Pfeffer v. UW (Parkside)*, 96–0109–PC-ER, 03/14/97,
and stated:

> In *Pfeffer,* the complainant contended his letter to the President of
> the University of Wisconsin System, a letter that questions the
> decision to transfer all third shift custodians to the day shift, was
> a whistleblower disclosure. In addition to complainant, 11 other
> custodians signed the letter. The Commission concluded that the
> letter did not allege a "pattern" of "incompetent management
> actions," and that it reflected a disagreement involving a "failure to
> act in accordance with a particular opinion regarding management
> techniques."

Hutson argues that while *Pfeffer* may offer some support
for the Commission's decision, two other cases, *Duran v. DOC*,
94–0005–PC-ER, 10/04/94, and *Canter (Kihlstrom) v. UW-
Madison*, 86–0054–PC-ER, 06/08/88, decided by the Commis-
sion but inexplicably ignored in its determination of her case,
support her position.

In *Duran*, the employee wrote a memo to a supervisor in
which she stated that the computer equipment in two offices was
not covered by a maintenance agreement and suggested that it
would be wise to enter into such an agreement. The employee

## D. Analysis

¶ 28. What constitutes "information" under WIS. STAT. § 230.80(5), and "mismanagement" under subsec-

complained that "she was subsequently blamed for the lack of a maintenance agreement" when a computer problem occurred in the offices. *Duran*, 94–0005–PC–ER, at 2. Denying the employer's motion to dismiss, the Commission concluded:

> The memo only refers to one condition, the absence of a mainte-
> nance agreement for the equipment in the two offices. Giving the
> memo the liberal construction which is required when ruling on
> the respondent's [(employer's)] motion [to dismiss], the memo may
> be read to indicate complainant's view that the lack of a mainte-
> nance agreement was "wrongful, negligent or arbitrary or capri-
> cious." The second issue related to disclosure is whether the memo
> meets the requirement that it describe "a pattern of incompetent
> management actions." The Commission has previously held that a
> grievance which related to only one action did not relate to a
> "pattern" of conduct. *Sadlier v. DHSS*, 87–0046, 0055–PC–ER,
> 03/30/89. Here, however, the condition of not having maintenance
> agreements does not relate solely to one piece of equipment. It
> relates to computers and printers located in two separate offices.
> Again, giving the memo a liberal reading, it can be said to satisfy
> the requirements for a written disclosure of "mismanagement"
> under the [W]histleblower [L]aw.

*Duran*, 94–0005–PC–ER, at 4 (footnote and emphasis omitted).

In *Canter*, the employee wrote three memos stating that more money should be requested for a particular account and that two medical professors had several outstanding invoices with a travel agency. Denying the employer's motion to dismiss the Commission concluded:

> The difficulty is in determining whether [the three written notes
> documenting the need for additional funds and alerting the
> employee's superiors to the doctors' failure to pay their bills]
> constituted disclosures of information. The Commission can con-
> ceive of circumstances where written communications, such as [the
> employee's memos], though neutral on their face, would act to
> inform the reader that the writer wished to identify improper

tions 230.80(5)(b) and (7), are matters of first impression for Wisconsin's appellate courts. In this case, we see several flaws in the Commission's analysis.

> governmental activities. Those circumstances would need to be established by evidence proffered at [a] hearing. Among the facts that the parties may seek to establish are: the manner the complainant normally informed her supervisor of telephone calls received; whether the respondent had any responsibility in the event staff declined to pay their travel expenses with [the travel agency]; the frequency and circumstances under which the complainant audited funds; and whether [the employee's] supervisor was made aware of such audits . . . . There appear to be disputes between the parties as to whether the complainant could have reasonably believed that mismanagement or a substantial waste of public funds had occurred.

*Canter*, 86–0054–PC–ER, at 7.

Hutson argues, "In contrast to the neutral statements" involved in *Duran* and *Canter*, she "repeatedly disclosed work assignments that were in violation of DOC rules," and supervision that was "arbitrary and capricious." The Commission responds that *Duran* and *Canter* are inapplicable because they were decisions on motions to dismiss complaints, not determinations following a lengthy hearing such as that in the instant case.

The Commission is incorrect. While the procedural posture of *Duran* and *Canter* differed from that of Hutson's case, the Commission's decisions in those cases, as in the instant one, relate to the legal issue of whether an employee's communication alleged a *pattern* of mismanagement.

Clearly, the Commission's decision in *Pfeffer* supports its legal position here. Just as clearly, however, its decisions in *Duran* and *Canter* support Hutson's position. The case-by-case conflicts are not surprising. After all, in none of those decisions could the Commission turn to appellate law for guidance. Now, with our decision in this case, we have the opportunity to interpret and clarify the legal standards to assist the Commission in the future.

¶ 29. First, we note that at the two portions of its decision where the Commission quoted Hutson's February 5 memo (in its factual findings and, later, in its introductory paragraph preceding its whistleblower decision just quoted), it did so incompletely. At both these critical junctures, the Commission failed to quote substantial portions of Hutson's memo. The first of the deleted portions states:

> I am 319 points above the 260 maximum caseload cap. According to the Department of Corrections manual CC/SD standards[,] cases classified as minimum are weighted as one point per case. I am aware of the fact that some specialized units are excluded from the 260 point caseload cap maximum. However, the exclusion only takes effect after a mutual agreement is reached between the Secretary of the Department of Corrections, the Regional Chief(s), D[OC] Employment Relations, AFSCME Council 24 and the local union. To my knowledge that has not occurred. Therefore, I am fully covered under the 1995–1997 contract and the agreement of a 260 workload cap maximum.

¶ 30. Without this deleted portion, Hutson's memo might seem to be one complaining of a "mere failure to act in accordance with [her] particular opinion regarding management techniques," thus not constituting information demonstrating "mismanagement" as defined by WIS. STAT. § 230.80(7). But with its explicit reference to DOC's own standards, and its implicit reference to a DOC-AFSCME agreement controlling any exception to those standards, it is difficult to discern any basis for concluding that Hutson's memo failed to adequately allege "mismanagement."

¶ 31. Second, and in a closely related sense, Hutson's memo, asking that "reasonable guidelines be established that would enable [her] to perform [her] job

to best meet the needs of the protection of the community, the Department of Corrections and [her]self as agent in the Minimum/Administrative unit," presented more than a personal complaint of "the mere failure to act in accordance with a particular opinion regarding management techniques." Wis. Stat. § 230.80(7). Here, again, we note that the Commission, at both portions of its decision where it quoted Hutson's memo, deleted critical words. It failed to quote: "to best meet the needs of the protection of the community, the Department of Corrections and [her]self as agent in the Minimum/Administrative unit."

¶ 32. And here, again, the deleted words weave into much more than personal matters or "particular opinion[s] regarding management techniques." *Id.* While the Commission argues that "[i]t is clear that Hutson simply disagreed with DOC management about what was or was not an excessive caseload," Hutson's memo emphatically and specifically expressed far more than simple disagreement. When one juxtaposes Hutson's memo, including these deleted words, to the position description of a DOC probation and parole agent, *see* n.1, the memo emerges as a clear and cogent attempt to alert DOC superiors to critical concerns at the very heart of Hutson's and her colleagues' ability to be "responsible for the provision of services to protect the public."

¶ 33. Third, the Commission, determining that Hutson's memo failed to disclose "a pattern of incompetent management actions which are wrongful, negligent or arbitrary and capricious and which adversely affect the efficient accomplishment of an agency function," Wis. Stat. § 230.80(7), concluded that the statutory language "reflect[ed] a clear legislative intent to provide the protections of the Whistleblower Law to

only those employe[e]s who identify a *series* of incompetent management actions, i.e.[,] more than an isolated instance of alleged mismanagement." We disagree.

¶ 34. In the first place, the Commission provided nothing to support its assertion of a "clear legislative intent" that would allow or require "pattern" to be read as "series," and on appeal, the Commission does not renew this theory. In fact, at oral argument before this court, the Commission conceded that the legislature has "left us with some puzzlement" in defining "mismanagement."[10] In the second place, such a theory

[10] In fact, from the legislative history, one might infer that the legislature *rejected* the proposition that "pattern" must be read as "series." The drafting records accompanying 1983 Wis. Act 409, § 9, leading to the legislature's definition of "mismanagement," *see* WIS. STAT. § 230.80(5), (6) and (7), reveal that, in the development of the assembly bill, several agencies suggested that "mismanagement" be defined as:

> a pattern of incompetent management actions *taken over a period of time,* not based solely on a difference of opinion as to proper management or courses of management action, but substantiated by a showing of wrongful, neglectful, or arbitrary and capricious actions having an adverse effect on the efficient accomplishment of agency programs or functions or which may reasonably be felt to produce an adverse effect on the efficient accomplishment of agency programs or functions.

Simple Amendment to Assembly Substitute Amendment of 1983 A.B. 240 (emphasis added). The ultimate definition of "mismanagement," however, included no such temporal standard.

Additionally, we note, on the senate side the drafters proposed strong and sweeping whistleblower protection, emphasizing that "it would seem the public interest would be served best by drawing the boundaries as wide as possible, covering . . . information about [many subjects including] likely threats to public safety." Note from Stuart Levitan in 1981

makes no sense; it would, in many instances, defeat the very purpose of the Whistleblower Law.

¶ 35. Interpreting a statute, we first look to the words the legislature has chosen and give the words of a statute their plain meaning. *Jungbluth v. Hometown, Inc.*, 201 Wis. 2d 320, 327, 548 N.W.2d 519 (1996). If the intent of the legislature is clear from a statute's language, we must give effect to this intent and look no further. *Jadair Inc. v. United States Fire Ins. Co.*, 209 Wis. 2d 187, 195, 562 N.W.2d 401 (1997). In the absence of ambiguity, we give words in a statute their common meaning, which may be established by reference to a recognized dictionary. *Kollasch v. Adamany*, 104 Wis. 2d 552, 563, 313 N.W.2d 47 (1981). When a statute "is capable of being construed in different ways, that construction which works an absurd or unreasonable result should be avoided." *Jadair*, 209 Wis. 2d at 195.

¶ 36. In WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993), "pattern" is defined as "a fully realized form, original, or model accepted or proposed for imitation: something regarded as a normative example to be copied." *Id.* at 1657. "Series," however, is defined as "a group of usu[ally] three or more things or events standing or succeeding in order and having a like relationship to each other." *Id.* at 2073. Obviously, therefore, a "pattern" may be triggered or established by a single act. *See Steinberg v. Arcilla*, 194 Wis. 2d 759, 769, 535 N.W.2d 444 (Ct. App. 1995) (No "minimum number of 'specific instances' " is required to establish

Senate Bill 524. Unquestionably, when probation and parole agents are required to carry caseloads that are so large as to make real supervision impossible, public safety is threatened.

"habit" under WIS. STAT. § 904.06(2); under certain circumstances, "one is enough."). Hutson's memo is an excellent example. Assuming, as the Commission did, that Hutson's memo complained of a single "wrongful and negligent management action," it nonetheless alerted her superiors to an action potentially affecting numerous probation and parole agents and thousands of offenders under their supervision.

¶ 37. What could better demonstrate "a pattern of incompetent management actions which are wrongful, negligent or arbitrary and capricious and which adversely affect the efficient accomplishment of an agency function"? *See* WIS. STAT. § 230.80(7). What possible purpose, consistent with the Whistleblower Law, could be served by requiring a probation and parole agent to await a "series" of actions before alerting superiors to a single action establishing a pattern that endangers our citizens? Indeed, in this case, Hutson's memo all but points directly at the very purpose of the Wisconsin State Employment Relations Act: "to provide state agencies . . . with competent personnel *who will furnish state services to citizens as fairly, efficiently and effectively as possible."* WIS. STAT. § 230.01(1) (emphasis added).

¶ 38. Therefore, we conclude, the Commission erred in determining that Hutson's February 5 memo was not a protected disclosure of "information" under WIS. STAT. § 230.80(5). Thus, we reverse and remand for the Commission to consider Hutson's retaliation claim under Wisconsin's Whistleblower Law.[11]

---

[11] Additionally, we have no hesitation in concluding, for all the reasons we have set out, that justice has miscarried in this case. Thus, if permitted to do so, we would also have based our decision on WIS. STAT. § 752.35, which allows for reversal "if it

*By the Court.*—Order reversed and cause remanded with directions.

appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried."

Here, the record prompts us to have serious concerns on both points. First, where, as we have pointed out, the Commission, in both its factual findings and analysis, has repeatedly deleted extensive and significant portions of the very memo it was evaluating, we are not confident that the real controversy was fully tried. Second, where, as the Commission found, the DOC Region Chief responded to Hutson's concerns, in part, by directing his subordinates to "separate . . . the trouble makers . . . and grind them down one by one," we understand that "something in this case is seriously amiss." *See State v. Watkins*, 2002 WI 101, ¶ 78, 255 Wis. 2d 265, 647 N.W.2d 244.

Nevertheless, we recognize that discretionary reversal under Wis. Stat. § 752.35 "is not applicable to a judicial review under ch. 227," *see Chicago & N.W.R.R. v. LIRC*, 98 Wis. 2d 592, 612–13, 297 N.W.2d 819 (1980), which provides its own procedures and standards for the review of determinations by administrative agencies. Wisconsin Stat. § 227.57(4) recognizes, however, that the fundamental-fairness criterion enfolded in Wis. Stat. § 752.35 is also a consideration to be applied in the review of administrative decisions. Thus, we may remand to the agency if we find "that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure." The record reveals both disjunctive predicates here and, therefore, on this additional ground, we send this case back to the Commission so that Hutson may have her day in court to demonstrate whether the written reprimand she received was in retaliation for her disclosure of information.