Vera Hutson, Plaintiff-Appellant,

v.

State of Wisconsin Personnel Commission,
Defendant-Respondent-Petitioner.

Supreme Court

No. 01–2959. *Oral argument March 6, 2003.—
Decided July 8, 2003.*

2003 WI 97

(Also reported in 665 N.W.2d 212.)

615

For the defendant-respondent-petitioner the cause was argued by *David C. Rice,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the plaintiff-appellant there was a brief by *Alan C. Olson* and *Alan C. Olson & Associates, S.C.,* New Berlin, and oral argument by *Alan C. Olson.*

An amicus curiae brief was filed by *Richard Briles Moriarty,* assistant attorney general, and *Peggy A. Lautenschlager,* attorney general, on behalf of the Wisconsin Department of Corrections.

¶ 1. JON P. WILCOX, J. This case involves interpretation of Wisconsin's so-called "whistleblower" law. The State of Wisconsin Personnel Commission (Commission) seeks review of a published court of appeals decision, *Hutson v. Personnel Commission,* 2002 WI App 249, 257 Wis. 2d 900, 654 N.W.2d 465, which reversed a circuit court judgment upholding the Commission's dismissal of an action for unlawful retaliation against the Wisconsin Department of Corrections (DOC) and remanded the case for additional proceedings.

¶ 2. The main question presented in this case is whether an employee's identification of a single management action is sufficient to qualify as a disclosure of information relating to "mismanagement" and trigger

protection from retaliation under the whistleblower law, Wis. Stats. §§ 230.80 to 230.89 (1995–96).[1]

¶ 3. Vera Hutson filed a complaint against the DOC with the Commission, alleging, among other things, unlawful retaliation against her because of her participation in activities protected by the whistle-blower law. She claimed that she was given a written reprimand in retaliation for a memo she wrote to her supervisor complaining of mismanagement.[2] Following a five-day hearing, the Commission issued a decision and order dismissing the complaint, finding that Hutson's memo was insufficient to satisfy the require-ments of a "disclosure" of "information" relating to

---

[1] Subchapter III of ch. 230 of the Wisconsin Statutes, including Wis. Stat. §§ 230.80 to 230.89, is entitled "Employe[e] Protection" and is more commonly known as the "whistle-blower" law because it includes provisions intended to encour-age employees to disclose certain types of information and protect employees from retaliation that might result from such disclosures. See Wis. Stat. §§ 230.83, 230.85.

All subsequent references to the Wisconsin Statutes are to the 1995–96 version unless otherwise indicated.

[2] Throughout the appellate process, Hutson has argued that this memo alone was not the sole protected action alleged. We accept the conclusion reached by the Commission, circuit court, and court of appeals that the memo is the sole basis alleged for the whistleblower claim. While, as the Commission and court of appeals explained, it is appropriate to consider the circumstances surrouding an alleged "disclosure," based on Hutson's post-hearing brief, only the February 5 memo was an alleged protected Whistleblower activity. Further discussion of this point is included as part of the analysis section. Unlike the court of appeals, however, we find that the record in this case does not support the assertion of a "pattern" as required under Wis. Stat. § 230.80(7).

"mismanagement" defined in Wis. Stat. § 230.80(7) as a "pattern of incompetent management actions."

¶ 4. Hutson then sought review of the decision in circuit court, and the Milwaukee County Circuit Court, David A. Hansher, Judge, affirmed the Commission's decision. Hutson appealed, and the court of appeals reversed and remanded the case, finding that Hutson's memo fit the definition of "mismanagement" and was a protected disclosure of information under Wis. Stat. § 230.80(5). We accepted the Commission's petition for review. We now reverse the decision of the court of appeals because we conclude that the Commission's statutory interpretation is correct. "Mismanagement" as defined in Wis. Stat. § 230.80(7) requires identification of more than a single management action, and Hutson's memo does not otherwise satisfy the requirements for a protected disclosure of information under whistleblower law.

I

¶ 5. The Commission's lengthy opinion included extensive findings of fact. Based on those findings, we discuss those facts, undisputed on appeal, that relate to and assist in clarifying the issue relating to Hutson's whistleblower law claim.

¶ 6. Vera Hutson began working for the DOC as a probation and parole officer in 1990. On October 2, 1995, Hutson began working in Unit 033, a new unit set up in the Milwaukee region specifically for the purpose of implementing a new statewide "administrative minimum" program approved by the legislature, under which the DOC could supervise low-risk offenders via a telephone call-in system. Hutson's immediate supervisor in Unit 033 was James Wake. Wake, in turn,

reported to Kathleen Ware, an assistant chief for the Milwaukee region. Ware's immediate supervisor was Allan Kasprzak, the chief for the Milwaukee region, and Kasprzak reported to Eurial Jordan, the administrator for the Department of Corrections Division of Probation and Parole. At the top of the DOC chain of command was Michael Sullivan, the Secretary of the Wisconsin Department of Corrections.

¶ 7. Hutson felt that there were management problems in the unit and that the caseload for agents in Unit 033 was excessive. At least two other agents in the unit shared her feelings regarding the caseload. At the times relevant to this case, caseloads for probation and parole agents were generally calculated on a point system "designed to reflect the amount of time spent by the agent supervising offenders," meaning that cases with higher supervision levels generated more points. Under a memo of understanding between the agents' union and management effective during the time period at issue here, the maximum caseload was 260 points. However, the point system had no category for situations in which the agent was not required to meet with the offender on a scheduled basis.

¶ 8. On February 5, 1996, Hutson wrote a memo to Wake, with copies to Ware and two union officials, stating:

> I am writing this correspondence to request workload relief and/or authorized overtime of one hour per every 5.5 points over the 260 point caseload cap per our union contractual agreement for the 1995–97 contract year. I am currently supervising a total of 559 cases, 475 under my agent number and 84 for a co-worker who will be out on sick leave for the next four to seven weeks. I am 319 points over the 260 maximum caseload cap. According to the [DOC] manual CC/SD standards cases clas-

619

sified as minimum are weighted as one point per case. I am aware of the fact that some specialized units are excluded from the 260 point caseload cap maximum. However, the exclusion only takes effect after a mutual agreement is reached between [DOC], AFSCME Council 24 and the local union. To my knowledge that has not occurred. Therefore I am fully covered under the 1995–97 contract and the agreement of a 260 workload cap maximum.

Due to the excessive workload and a caseload that continues to grow without a foreseeable end, coupled with the lack of clarity under a supervisory style that is extremely arbitrary and capricious, I have found the work environment to be highly stressful and terribly distracting to try to manage my caseload adequately and professionally. I am at this time requesting that reasonable guidelines be established that would enable me to perform my job to best meet the needs of the protection of the community, the [DOC] and myself as agent in the Minimum/Administrative unit.

Your timely response will be appreciated;

Sincerely,

Vera Hutson

¶ 9. On February 9, 1996, Wake responded to Hutson's memo with a memo scheduling a meeting to discuss Hutson's concerns. Ware also received a copy of Wake's memo. When Hutson subsequently informed Wake of a scheduling conflict, Wake rescheduled the meeting.

¶ 10. Before any meeting took place, however, Wake and Hutson got into a heated argument. Hutson was out on medical leave from February 7, 1996, to February 19, 1996. According to a memo from Wake to Ware, on February 19, Hutson shouted at Wake and

accused him of harassment and racism when Wake approached her regarding a case and directed her to take a particular course of action to remedy a problem that had occurred while she was gone. In response to this argument, Wake contacted two of Hutson's previous supervisors to find out about their experiences with Hutson. In talking with Wake, both of these previous supervisors noted problems working with Hutson.

¶ 11. On February 21, 1996, Wake filed a complaint with the DOC's Affirmative Action office, alleging that Hutson was harassing him and creating a bad work environment. As a result of the argument on February 19, 1996, Wake began a separate file on the interactions he had with Hutson lest Hutson should file a complaint against him. From that point on, Wake communicated with Hutson in writing or made sure that a third party was present when speaking with her.

¶ 12. On February 29, 1996, Wake, Ware, and Hutson met regarding Hutson's "workload relief" memo. Ware asked Hutson to describe the problems she observed in the unit. After hearing Hutson's comments on such issues as an absence of guidelines and problems with Wake's management of the unit, Ware explained Unit 033 was not subject to the point limits regarding caseload that applied to other units under the union memo of understanding. Wake and Ware also met with agents Michelle McKinstry and Vicki Turner on the "workload relief" issue.

¶ 13. On March 5, 1996, Ware sent a memo to Hutson, McKinstry and Turner, stating, in relevant part:

> As Supervisor James Wake and I have concluded meeting with each of you regarding your request for workload relief I want to advise you that no formal action to

reassign workload or reduce the number of cases assigned will be taken at this time. The reasons for this are as follows:

—No point classification is assigned to cases within the unit at this time. As you were advised, the legislature removed workload credit for minimum/administrative from the CC/SD system effective Jan. 1, 1996.

—In your request you indicated that per manual chapter 02.03.01–.02 cases at minimum are assigned 1 point. As you were advised, you are not required to meet the manual standards of face to face contact or home visits as appropriate which based on a time study generated 1 point.

—At present the unit does not have an exemption to the memorandum of understanding; however, the process has been started.

¶ 14. Wake held a unit meeting on March 13, 1996, regarding procedures, practices, and issues within the unit. Wake terminated the meeting after Hutson stated to Wake: "You are treating us like slaves."

¶ 15. On March 15, 1996, Hutson wrote a memo to Allan Kasprzak. She sent copies of this memo to Wake, Ware, and a union representative. This memo stated, in part:

Allan I am sending this correspondence to you out of [f]ear and frustration. It seems no one is willi[n]g to listen to our concerns regarding Jim Wake. I gave a memo to you, Kathy Ware and Jim regarding workload relief. Every [sic] since I give [sic] that memo Jim['s] behavior towards me has escalated in very intimidating, harrassing [sic] and vindictive actions. The memo of 2–6-96 was addressed in a meeting with Kathy Ware and Jim and myself on 2–29–96. However, as I stated to

Kathy and in the meeting with Jim present the issues were not just workload relief. The issues were also Jim's behavior as a Supervisor. I have gotten to the point that I fear for my personal safety. Especially since 3–13–1996 when Jim angrily and abruptly stopped our unit meeting. . . . Jim's demeanor has [been] and is causing the environment in the unit to be very tense. Other agents have voiced their concerns of fear for their personal safety. Something is very, very wrong down here. We should not have to work in such an environment. I am asking for your help in trying to resolve the concerns we have in this unit. As well as the above issues there are definite issues of favoritism and probably nepotism. There is a definite divide in the unit created by Jim. Due to my fearing for my personal safety, I feel the need to inform others about the concerns in this unit. I have gotten to the point that I can't focus on my work, I am very stressed when I leave work and I am starting to lose sleep because the conditions in this unit are very unsafe, unstable, and Jim Wake does not allow ANY of us to discuss the issues.

¶ 16. Hutson also wrote a memo to Wake on March 15, 1996, stating:

Jim I am leaving to go home. I will use personal time. I am afraid for my personal safety in regards to your behavior towards me. I feel very uncomfortable to the point it is affecting my job.

¶ 17. In response to Hutson's memo, Kasprzak promptly organized a meeting. On March 19, 1996, three meetings took place related to Hutson's complaints. The first meeting was attended by Kasprzak, Wake, Ware, Hutson, McKinstry, Turner, a union representative, and another assistant regional chief, John Barian. Topics at this meeting included the workload and other unit issues.

623

¶ 18. The second meeting was attended by Hutson, Wake, Ware, Kasprzak, and a union representative. Here the topic was Hutson's allegation that Wake made her workplace unsafe.

¶ 19. Kasprzak, Wake, and Ware also gathered for a third meeting that day. Wake took contemporaneous notes at this meeting. The notes describe Kasprzak's comments regarding Hutson, Turner, and McKinstry. These notes, described by the Commission as "accurately describ[ing] Mr. Kasprzak's comments" state, in part:

> —I am a wimp for saying that I was extremely upset and hurt by remarks Vera has made. He said he would not move me, even temporarily, this would [undecipherable] like caving in to them.
>
> . . . .
>
> —It was like a pack of dogs seeing someone in fear if I was to show hurt or weakness - the "dogs" would attack me if they saw weakness.
>
> . . . .
>
> —The strategy is to separate them (the trouble makers) and grind them down one by one[.]
>
> —The way to beat a bully is to beat him senseless.
>
> . . . .
>
> I just ignore harassment complaints against me. The Dept will ride it out and the complainant will be bought off and the reward to them (complainant is piddly). They gave [an agent] $7000. After attorney fees she got nothing.
>
> This is all part of being a manager.

624

Wake reported these comments to Eurial Jordan. Jordan later spoke with Kasprzak, telling him that the comments at the March 19 meeting were inappropriate.

¶ 20. In a memo dated March 19, 1996, Kasprzak memorialized the "outcomes" of the meetings, stating, among other things, that the caseload classification would be checked on and members of the unit pledged to work on attaining a harassment free work environment.

¶ 21. On March 29, 1996, Hutson spoke with DOC Secretary Michael Sullivan regarding Unit 033. Hutson then sent Sullivan a memo on April 22, 1996, with the subject "Re: Harassment, [R]etaliation, Intimidation & Racial Discrimination from Kathy Ware [Assistant] Chief, James Wake Unit Supervis[or]" and requesting assistance with the issues relating to Wake and Ware.

¶ 22. In a memorandum dated April 19, 1996, Ware directed Hutson to report for an investigatory interview related to allegations that Hutson violated several work rules. An investigatory interview was conducted on April 30, 1996. Hutson attended with a union representative. Ware prepared a report summarizing the results of the interview that she submitted to Eurial Jordan in a memorandum dated May 6, 1996. Ware recommended that there be a pre-disciplinary hearing for violation of work rules.

¶ 23. Sometime in April 1996, Hutson filed a complaint alleging discrimination based on race and military status with the DOC Affirmative Action office. This complaint was subsequently investigated and resulted in a finding of "no probable cause."

¶ 24. Hutson was out on medical leave from May 9 to June 10, 1996. Effective June 10, 1996, Hutson transferred out of Unit 033.

¶ 25. In May 1996, Hutson was directed to report for a pre-disciplinary hearing. Hutson objected to Ware presiding over the proceeding, so Assistant Chief John Barian handled the hearing. The hearing took place sometime during the summer of 1996, and Barian issued a pre-disciplinary report to Jordan on August 6, 1996, finding that "[t]he investigation supports just cause and mitigation seems to be more of offering excuses" and recommending that Hutson be disciplined. On August 19, 1996, Hutson received a written reprimand. The reprimand states that Hutson violated three work rules:

> Work Rule A-1: "Insubordination, disobedience, or failure to carry out assignments or instructions."
>
> Work Rule A-4: "Negligence in performance of assigned duties."
>
> Work Rule A-13: "Intimidating, interfering with, harassing (including sexual or racial harassment), demeaning, or abusive language in dealing with others."

The reprimand included a list of seven violations including harassment of an offender, accusing a co-worker of spying for management, and failing to take appropriate action in several of her cases. According to the Commission's findings, Hutson appealed the discipline to arbitration, but the imposition of the written reprimand was upheld.

¶ 26. Hutson filed a complaint with the Commission against the DOC on June 6, 1996, alleging that she was discriminated against on the basis of her military status and race and that she was retaliated against in violation of the Wisconsin Fair Employment Act (FEA), Wis. Stats. §§ 111.31–111.395, and the whistleblower law, Wis. Stats. §§ 230.80–230.89. Later, the parties

agreed that the issue to be resolved by the Commission was narrowed to whether she was retaliated against for activities protected under the FEA or the whistleblower law.

¶ 27. Between May 11, 1999 and June 24, 1999, the Commission held a five-day hearing on Hutson's claims. On August 28, 2000, the Commission dismissed the complaint, finding: 1) that Hutson "failed to engage in a protected activity under the whistleblower law;" and 2) the violations alleged against Hutson were supported in the record, the disciplinary process for the violations began before Hutson engaged in activity protected under the FEA, and therefore, the decision to reprimand Hutson was not based on the FEA protected activities. Specifically related to Hutson's whistleblower law claims, the Commission found that her February 5, 1996 memo failed to satisfy the statutory requirements of a disclosure of "information" relating to "mismanagement." The Commission found that there was no "pattern of incompetent management actions" as required by Wis. Stat. § 230.80(7), because the statutory language "reflects a clear legislative intent to provide the protections of the whistleblower law to only those employees who identify a *series* of incompetent management actions, i.e. more than an isolated instance of alleged mismanagement." (Emphasis in original.)

¶ 28. Hutson sought review of the Commission's decision in circuit court. The circuit court affirmed the Commission's ruling on September 20, 2001. Hutson again appealed the ruling regarding her whistleblower claim.[3] On September 10, 2002, the court of appeals reversed and remanded the case to the Commission,

---

[3] Hutson did not appeal the ruling upon her Wisconsin Fair Employment Act claims. Also, those claims have not been raised

finding that a "pattern" could be established by a single act and that, therefore, the Commission erred in its determination that Hutson's February 5, 1996 memo was not a protected disclosure of information under the whistleblower law. We accepted the State's petition for review on December 10, 2002. We now reverse.

## II

¶ 29. We must first address the proper standard of review. An agency's findings of fact will not be overturned as long as they are supported by substantial evidence; "we may not substitute our judgment for that of [the agency's] as to the weight of the evidence." *Kannenberg v. LIRC,* 213 Wis. 2d 373, 384, 571 N.W.2d 165 (Ct. App. 1997); *see also Jicha v. DILHR,* 169 Wis. 2d 284, 290, 485 N.W.2d 256 (1992).

¶ 30. This case also requires us to interpret the statutory language of the whistleblower law, Wis. Stat. §§ 230.80–230.89. The purpose of statutory construction is to discern the intent of the legislature. *Kelley Co. v. Marquardt,* 172 Wis. 2d 234, 247, 493 N.W.2d 68 (1992) (quoting *Terry v. Mongin Ins. Agency,* 105 Wis. 2d 575, 583, 314 N.W.2d 349 (1982)).

¶ 31. Statutory interpretation is a question of law that we review de novo, and as such, we are not bound by an agency's interpretation. *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 659, 539 N.W.2d 98 (1995); *Sauk County v. WERC,* 165 Wis. 2d 406, 413, 477 N.W.2d 267

in the appeal to this court. Hutson has therefore waived these claims and we do not address them.

(1991); *Kannenberg,* 213 Wis. 2d at 384. However, this court has generally applied one of three levels of deference to agency conclusions of law and statutory interpretation: great weight, due weight, or de novo. *See Sauk County,* 165 Wis. 2d at 413–14; *Jicha,* 169 Wis. 2d at 290–91. The degree of deference given to an agency's statutory interpretation depends upon the extent to which the "administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute." *Kelley Co.,* 172 Wis. 2d at 244; *see also State ex rel. Parker v. Sullivan,* 184 Wis. 2d 668, 699, 517 N.W.2d 449 (1994) (the level of deference "depends on the comparative institutional capabilities and qualifications of the court and the administrative agency").

¶ 32. This court has found that "great weight," the highest level of deference, is appropriately accorded when certain conditions are met:

> (1) the agency was charged by the legislature with the duty of administering the statute; (2) [] the interpretation of the statute is one of long-standing; (3) [] the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) [] the agency's interpretation will provide uniformity and consistency in the application of the statute.

*UFE Inc. v. LIRC,* 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996) (quoting *Harnischfeger Corp.,* 196 Wis. 2d at 660). Further, "[w]here a legal question is intertwined with factual determinations or with value or policy determinations . . . a court should defer to the agency which has primary responsibility for determination of fact and policy." *Sauk County,* 165 Wis. 2d at 413 (quoting *West Bend Education Ass'n v. WERC,* 121 Wis. 2d 1, 12, 357 N.W.2d 534 (1984)). The "great weight"

standard has been called the general rule in Wisconsin. *Id.* Under this standard, as long as the agency interpretation is reasonable and not contrary to the clear meaning of the statute, it will be upheld, even if the court finds that another interpretation is more reasonable. *UFE,* 201 Wis. 2d at 286–87; *Kannenberg,* 213 Wis. 2d at 385.

¶ 33. The middle level of deference is known as "due weight" or "great bearing." *Kelley Co.,* 172 Wis. 2d at 244. The "due weight" standard is used "if the agency decision is 'very nearly' one of first impression." *Sauk County,* 165 Wis. 2d at 413–14. Put another way, we give "due weight" under circumstances where "the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." *UFE,* 201 Wis. 2d at 286. As we have noted previously, deference to the agency's interpretation under these circumstances is not warranted based on the agency's expertise per se; rather, it is based on the fact that the legislature entrusted enforcement of the particular statute to the agency. *Id.* We have further explained the reasoning behind and application of this standard:

> Since in such situations the agency has had at least one opportunity to analyze the issue and formulate a position, a court will not overturn a reasonable agency decision that comports with the purpose of the statute unless the court determines that there is a more reasonable interpretation available.

*Id.* at 286–87.

■

¶ 34. The lowest level of deference accorded is de novo review, under which the agency's interpretation is given no weight at all. *Sauk County,* 165 Wis. 2d at 414. This standard is only applied when the issue is "clearly one of first impression" for the agency or "when an agency's position on an issue has been so inconsistent so as to provide no real guidance." *UFE,* 201 Wis. 2d at 285 (internal citations omitted).

¶ 35. The Commission argues that its interpretation is entitled to "great weight" deference. There does appear to be some support for such deference. First, the legislature has charged the Commission with enforcement of the whistleblower law provisions. Second, although the Commission only cited to one of its prior cases in analyzing Hutson's whistleblower claim, *Pfeffer v. UW (Parkside),* 96–0109–PC–ER, 3/14/97, the Commission has, in several additional cases, interpreted the sufficiency of disclosures under the whistleblower law, including cases requiring interpretation of the terms "pattern of incompetent management actions." *See Duran v. DOC,* 94–0005–PC–ER, 10/4/94; *Sadlier v. DHSS,* 87–0046, 0055–PC–ER, 3/30/89; *Kortman v. UW-Madison,* 94–0038–PC–ER, 11/17/95; *Elmer v. Dept. of Agriculture, Trade & Consumer Protection,* 94–0062–PC–ER, 11/14/96 (dealing more generally with sufficiency of a claim of protection under the whistleblower law). Several of these cases are distinguishable in that they deal with motions to dismiss where the standards applied are more lenient; nevertheless, the Commission has had cause, over a period of years, to examine the standards for a protected disclosure of "information" relating to "mismanagement." In *Sadlier,* 87–0046, 0055–PC–ER, 3/30/89, at 43, for example, the Commission explicitly found that a grievance did not

qualify as a protected disclosure, meeting the definition of "mismanagement," because the complaint referred to only one action as opposed to " 'a pattern' of actions." The Commission noted there was no indication in the case that the interview complained of was one of a *series* of interviews. *Id.* Third, applying the Commission's interpretation would lend uniformity and consistency to application of this statute. Finally, the Commission has, at least arguably, dealt with a policy determination related to the whistleblower law by interpreting "pattern" to require more than one incompetent management action.

¶ 36. Because several of the Commission's precedents have dealt with the less stringent standards relating to motions to dismiss and are distinguishable on that ground,[4] and because the Commission has not necessarily developed or employed any "special expertise" in applying the statutory language, we apply a "due weight" standard. Even applying such a standard, however, we conclude that the Commission's interpretation of the statutory language is correct and should be upheld, because its interpretation is more reasonable than that argued by Hutson. Even if they were equally reasonable, we would uphold the Commission's interpretation, because, as we noted in *UFE*, 201 Wis. 2d at

[4] In *Canter(Kihlstrom) v. UW-Madison*, 86–0054–PC–ER, 6/8/88, at 4–5, the Commission explained its analysis for a motion to dismiss: "The respondent's motion for failure to state a claim requires the Commission to analyze the complainant's allegations liberally in favor of the complainant and to grant the motion only if it appears with certainty that no relief can be granted." If the motion is denied, the respondent is free to raise the contention again during subsequent hearings. *See id.* at 8; *Duran v. DOC*, 94–0005–PC–ER, 10/4/94, at 8.

287 n.3, "[u]nder either due weight or great weight deference, an equally reasonable interpretation of a statute should not be chosen over the agency's interpretation."

### III

¶ 37. The policy behind Wisconsin's whistleblower law, Subchapter III of Chapter 230 of the Wisconsin Statutes and entitled "Employe[e] Protection," was to protect employees from retaliation and encourage disclosure of certain information. Wis. Stat. § 230.01(2). However, the statutes provide specific parameters for protection. Although these protective statutes are to be liberally construed, *see* Wis. Stat. § 230.02, only certain disclosures made a particular way and regarding a subject matter covered in the statute will qualify for protection. As the Commission has noted in interpreting the whistleblower law:

> [T]he whistleblower law covers only certain specific kinds of disclosures made in specific ways. The legislature obviously did not intend to provide blanket protection for any kinds of employe utterances which might result in retaliation by the employing agency.

*Elmer,* 94–0062–PC-ER, 11/14/96 at 4.

¶ 38. In order to gain protection under the whistleblower law, an employee must meet the requirements laid out in the relevant statutory provisions. Wisconsin Stat. 230.83(1) provides: "No appointing authority, agent of an appointing authority or supervisor may initiate or administer, or threaten to initiate or administer, any retaliation against an employee." "Retaliatory action" is defined in Wis. Stat. § 230.80(8) and includes disciplinary action taken because "[t]he employee lawfully disclosed information under s. 230.81 or filed a complaint under s. 230.85(1)."

¶ 39. Before an employee is entitled to protection, the employee must make a disclosure of information in writing, typically to his or her supervisor. Wis. Stat. § 230.81(1)(a). "Information" is defined in Wis. Stat. § 230.80(5):

> "Information" means information gained by the employe which the employe reasonably believes demonstrates:
>
> (a) A violation of any state or federal law, rule or regulation.
>
> (b) Mismanagement or abuse of authority in state or local government, a substantial waste of public funds or a danger to public health and safety.

Mismanagement is, in turn, more precisely defined in Wis. Stat. § 230.80(7):

> "Mismanagement" means a *pattern of incompetent management actions* which are wrongful, negligent or arbitrary and capricious and which adversely affect the efficient accomplishment of an agency function. "Mismanagement" does not mean the mere failure to act in accordance with a particular opinion regarding management techniques.

(Emphasis added.) Thus, only disclosures of "information" that meet the statutory criteria qualify for protection under the whistleblower law.

¶ 40. Before proceeding to examine the merits of Hutson's claim, we note that Hutson has consistently disputed the Commission's findings regarding the basis for her claims. We must clarify exactly what "disclosures" Hutson has claimed are protected by the whistleblower law and further, what type of "information" she has alleged the disclosures to contain. Under the defi-

nition of "information" in Wis. Stat. § 230.80(5)(a), an employee is protected for disclosures of information that relate to one of four issues: mismanagement, abuse of authority in state or local government, substantial waste of public funds, or danger to public health and safety. The only claim made in this case is mismanagement. At oral argument in this case, there was some discussion regarding whether or not the information Hutson disclosed might fit the "public health and safety" category. We need not decide that issue. The record from the Commission makes clear that Hutson only made claims under the FEA and under the whistleblower law. Regarding the whistleblower law allegations, the record also makes clear that Hutson's only claim was that of mismanagement. Since other potential claims or characterizations of the information were not argued before the Commission, Hutson may not now attempt to raise such arguments here. Thus, this court only examines whether Hutson disclosed information related to "mismanagement" that triggers protection from retaliation under Wis. Stat. § 230.83.

¶ 41. We must also establish what specific disclosure of information Hutson claims is protected under whistleblower law. Throughout the appellate process, Hutson has claimed that her February 5, 1996 memo is but one of several disclosures that should be protected under the whistleblower law. However, the Commission argues that the only disclosure at issue is the February 5 memo. The circuit court and the court of appeals examined only the February 5 memo.[5] We agree with

---

[5] We acknowledge that the court of appeals determined that it need not consider subsequent communications because it found the February 5 memo alone qualified as a protected

the Commission and find that the only issue before us is whether the February 5, 1996 memo written by Hutson was sufficient to satisfy the statutory requirements for

disclosure. Even the court of appeals, though, found that Hutson "has offered nothing to rebut the Commissioner's statement" that Hutson identified only the February 5 memo as her protected activity under the whistleblower law. *See Hutson v. Personnel Commission,* 2002 WI App 249, ¶ 19 n.8, 257 Wis. 2d 900, 654 N.W.2d 465. The Commission in this case explicitly recognized in its decision that the adequacy of the disclosure was not limited to the "four corners of the disclosing document," but nonetheless found that the references in the February 5 memo were insufficient to satisfy the statutory requirements.

In *Elmer v. DATCP,* 94–0062–PC-ER, 11/14/96, at 3, the Commission found that under Wis. Stat. § 230.80(5), the "information" disclosed must "have a specific, substantive content" in order to be eligible for protection. The Commission in *Elmer* found that a note scheduling a meeting could not "somehow utilize its connection with the meeting to become a protected disclosure under the law." *Id.* While the Commission acknowledged, in both *Elmer* and the present case, that there is some flexibility to the specificity required and that the surrounding circumstances may be considered, substantive allegations are necessary. Here, the Commission considered only whether the February 5 memo was a protected activity under the whistleblower law. However, the Commission expressly acknowledged in its opinion that the "the meaning and extent of the disclosure can be informed by the surrounding circumstances." *Hutson v. DOC,* 96–0056–PC-ER, 8/28/2000, at 34 n.10, 36 n.12. We have reviewed the record in this case and considered the surrounding circumstances, but find, as did the Commission, that the allegations are insufficient to establish a "pattern" as required under the whistleblower law. Everything in this case emerged from Hutson's February 5 memo requesting "workload relief." Her later meetings and even her later written complaints about Mr. Wake do not help clarify and establish the "pattern of incompetent management actions" required under Wis. Stat. § 230.80(7).

protection. In footnote 11 of its decision, the Commission explicitly stated why it only examined the single disclosure: "There was some discussion at hearing of other possible protected activities, but complainant has, in her brief, clearly identified the February 5th 'work relief' memo as the basis for her claim of whistleblower protection." Indeed, Hutson's post-hearing brief does indicate that the February 5 memo alone is the basis for her whistleblower claim. As such, we address only whether that memo qualifies as a protected disclosure under Wis. Stats. §§ 230.80 to 230.89.

¶ 42. As noted, on February 5, 1996, Hutson wrote a memo to her supervisor, Wake, stating:

> I am writing this correspondence to request workload relief and/or authorized overtime of one hour per every 5.5 points over the 260 point caseload cap per our union contractual agreement for the 1995–97 contract year. I am currently supervising a total of 559 cases 475 under my agent number and 84 for a co-worker who will be out on sick leave for the next four to seven weeks. I am 319 points over the 260 maximum caseload cap. According to the [DOC] manual CC/SD standards cases classified as minimum are weighted as one point per case. I am aware of the fact that some specialized units are excluded from the 260 point caseload cap maximum. However, the exclusion only takes effect after a mutual agreement is reached between [DOC], AFSCME Council 24 and the local union. To my knowledge that has not occurred. Therefore I am fully covered under the 1995–97 contract and the agreement of a 260 workload cap maximum.
>
> Due to the excessive workload and a caseload that continues to grow without a foreseeable end, coupled with the lack of clarity under a supervisory style that is extremely arbitrary and capricious, I have found the work environment to be highly stressful and terribly

distracting to try to manage my caseload adequately and professionally. I am at this time requesting that reasonable guidelines be established that would enable me to perform my job to best meet the needs of the protection of the community, the [DOC] and myself as agent in the Minimum/Administrative unit.

¶ 43. Hutson argues that the Commission erred by concluding that she did not disclose a "pattern" of incompetent management actions as required by the statutory definition of mismanagement, Wis. Stat. § 230.80(7). Hutson contends that the word "pattern" should be interpreted to include a continuous course of conduct. She argues that the excessive workload complained of in her memo was a continuous and ongoing problem of mismanagement. Citing federal, state, and agency discrimination decisions applying "continuous course of conduct" theories, Hutson asserts that her contention of an excessive caseload describes ongoing conduct sufficient to constitute a "pattern of mismanagement." For example, Hutson cites, among other sources, two Wisconsin administrative agency decisions, *Rudie v. DHSS & DER,* 87–0131–PC-ER, 9/19/90, and *Kortman v. UW-Madison,* 94–0038–PC-ER, 11/17/95, to support her argument that the continuing violation theory has been applied. She argues that in *Kortman,* a whistleblower case, the Commission has already applied the "continuing violation" theory. *See Kortman,* 94–0038–PC-ER, 11/17/95, at 5.

¶ 44. We find that Hutson's dependence upon the *Kortman* case is misplaced. Although the opinion does discuss application of a "continuing violation theory," the issue was the statute of limitations. Further, this case, like many of the other relevant Commission decisions, deals with a motion to dismiss. Finally, the Commission states:

638

> [W]here the complainant alleges a pattern of harassment or a pattern of actions designed to achieve a particular result ... the Commission has applied a continuing violation theory if at least one of the actions falls within the statutory time period and as long as there is not a sufficient length of time between actions to "break the chain" which links the pattern of actions together.

*Kortman,* 94–0038–PC-ER, 11/17/95, at 5. This explanation still suggests that multiple actions must occur for a "pattern" to exist. The Commission uses the phrase "at least one of the action*s*" and "pattern of action*s*." (Emphasis added.) Even if one must fall within the statutory time period, the statement suggests more than one action must have occurred.

¶ 45. The Commission found that Hutson raised several topics in her February 5 memo, including the "supervisory style that is arbitrary and capricious," the lack of guidelines, and the excessive workload. At least in her court of appeals brief, Hutson agreed that the Commission addressed the correct topics, but asserted that the Commission erred in finding they were insufficient to show a "pattern of incompetent management actions." The Commission first found that the references to an arbitrary and capricious supervisory style and a lack of guidelines were too general and conclusory to satisfy the requirements for a disclosure of information within the meaning of Wis. Stat. § 230.80. The Commission found these references might relate to the "general concept" of mismanagement defined in the statute, but were so general and conclusory that "it is impossible to say that these references in her February 5th memo describe mismanagement."

¶ 46. The other topic in the memo is Hutson's allegation of an excessive caseload. The Commission expressed serious doubts about whether, in fact, the workload was excessive, but assumed for purposes of its analysis that it was excessive and as such, constituted a wrongful or negligent management action as described in Wis. Stat. § 230.80(7). It also assumed that the claim was not merely a difference of opinion over management techniques, which would fall outside the whistle-blower protections because of the exclusion in Wis. Stat. § 230.80(7). The Commission, citing its decision in *Pfeffer*, 96–0109–PC–ER, 3/14/97, found that the disclosure did not describe a "pattern" of incompetent management actions, noting that protection was provided only to those employees disclosing a "series" of incompetent management actions, not merely isolated incidents.

¶ 47. We agree with the Commission's determination regarding the first topics in the February 5 memo. The references to "arbitrary and capricious" supervision and a lack of guidelines, lack any specific description of mismanagement. Inasmuch as these relate to the alleged excessive caseload, they add no further explanation of the claim. These raw allegations do not even provide enough information to determine if they might reflect a simple disagreement over management techniques.

¶ 48. That conclusion leaves us to define the term "pattern" and, more broadly, a "pattern of incompetent management actions." We do not dispute that, in the abstract, "pattern" might have a variety of meanings, including the meaning used by by the court of appeals in this case. The court of appeals, citing *Webster's Third New International Dictionary* (1993), defined " 'pattern' " as " 'a fully realized form, original, or model

640

accepted or proposed for imitation: something regarded as a normative example to be copied.' " *Hutson,* 257 Wis. 2d 900, ¶ 36. Based on that definition, the court of appeals concluded that "obviously" a pattern could be established by a single act. We do not disagree that "pattern" has that meaning in some contexts. However, we do not agree that this definition makes sense in the context of this statute. We believe the language of the statute is clear.

¶ 49. The first step in any statutory analysis is to look at the language of the statute. *See Jungbluth v. Hometown, Inc.,* 201 Wis. 2d 320, 327, 548 N.W.2d 519 (1996). "When construing statutes, meaning should be given to every word, clause and sentence in the statute, and a construction which would make part of the statute superfluous should be avoided wherever possible." *Kollasch v. Adamany,* 104 Wis. 2d 552, 563, 313 N.W.2d 47 (1981) (internal citation omitted). Wisconsin Stat. § 230.80(7) provides, in relevant part:

> "Mismanagement" means a *pattern of incompetent management actions* which are wrongful, negligent or arbitrary and capricious and which adversely affect the efficient accomplishment of an agency function.

(Emphasis added.) The language of this statute suggests the interpretation taken by the Commission is correct. First, the definition uses the plural term "actions." Second, if the term "pattern" means what the court of appeals suggests, it is essentially rendered superfluous to the statute. If pattern means "a model" and therefore, one action is enough to trigger protection, the term "pattern" is unnecessary. Were the statute to read: "Mismanagement means incompetent management actions which are wrongful, negligent or arbitrary

and capricious," the same effect would be had, because a single example of an incompetent management action would be sufficient to satisfy the definition.

¶ 50. Finally, according to *Black's Law Dictionary* 1149 (7th ed. 1999), a "pattern" means: "A mode of behavior or series of acts that are recognizably consistent . . . ." Consistency suggests that there must be a comparison, a reference of one action to another that suggests similarity. Clearly, under this definition, one action would be insufficient to establish a "pattern."

¶ 51. Even if one were to believe that Wis. Stat. § 230.80(7) is ambiguous, and accept Hutson's argument that "pattern" could be interpreted to include ongoing violations and that her allegation was sufficient to describe an ongoing violation, under the "due weight" level of deference we apply, the agency's interpretation would still be upheld. So long as the agency's interpretation is at least as reasonable as Hutson's, under "due weight," the agency interpretation is accepted. We cannot accept that the plural connotation of the term "pattern" is unreasonable, or that it is not at least as reasonable as Hutson's interpretation. As such, even were we to find the statute ambiguous, the agency's interpretation should be upheld.

¶ 52. Although a more liberal standard is used by the Commission for motions to dismiss, several of the Commission's cases deal with the term "pattern" and support the interpretation the Commission took in the present case. At least one case interpreted "pattern" outside the context of a motion to dismiss. As previously noted, in *Sadlier,* 87–0046, 0055–PC–ER, 3/30/89, at 43, the Commission found that a disclosure failed to meet the definition of a protected disclosure of "mismanage-

ment" because it did not relate to a "pattern" of actions; it did not allege the act was one of a series. In the context of a motion to dismiss, in *Duran,* 94–0005-PC-ER, 10/4/94, at 4, the Commission noted the requirement that a disclosure describe " 'a *pattern* of incompetent management actions.' " (Emphasis in original.) In the *Duran* case, the Commission found that, at least in the context of a motion to dismiss and "giving the memo a liberal reading," the disclosure could satisfy the definition because it related to various pieces of equipment at two separate offices. *Id.* Similarly, in *Pfeffer,* 96–0109–PC-ER, 3/14/97, at 6, the Commission found that the requirement of a "pattern" of "incompetent management actions" was not met because the disclosure only related to "a disagreement by certain UW-Parkside custodians with *a decision by management* to transfer all third shift custodians to the day shift." (Emphasis added.) Thus, the Commission noted there was only a singular decision by management. In addition, the Commission found the allegations failed because they referenced only a disagreement regarding management techniques. *Id.*

¶ 53. We now must determine whether the Commission's interpretation taken in Hutson's case is reasonable. According to this court's decision in *Parker,* 184 Wis. 2d at 700 n.36,

> An agency's interpretation of a statute is reasonable if it accords with the language of the statute, the statute's legislative history and the legislative intent and if the interpretation is consistent with the statute read as a whole, and the purpose of the statute; and if the interpretation is consistent with judicial analyses of the statute.

(Internal citation omitted.) We have already examined the language of the statute. The legislative history of

the statute provides even more support for the agency's interpretation. The drafting record for 1983 Wisconsin Act 409, the bill creating the whistleblower law, indicates that early drafts did not even contain a definition of mismanagement. During the drafting process, at least two agencies, the Department of Administration and the Department of Employment Relations, requested a definition be added and proposed language for such an amendment. A letter from the Department of Administration, included in the drafting record for 1983 Wisconsin Act 409, proposed that "mismanagement" means "a pattern of incompetent management acts taken over a period of time, not based solely on a difference of opinion as to proper management courses of action." Most of this language became what is today the definition of mismanagement in Wis. Stat. § 230.80(7). The court of appeals made much of the fact that the phrase "taken over a period of time" was not put into the statute, indicating that the elimination of this phrase supports the interpretation that a single act is enough. We disagree. As the Commission points out, a drafter's note in the drafting record, indicates that the drafter of the bill already felt the provisions were overly wordy. The drafter's note states: "I've done the best I could with language you know I consider unnecessarily wordy." The phrase may well have been eliminated because the drafter felt a "pattern of incompetent management actions" inherently required a period of time to occur and thus, the phrase would be redundant. Whether or not that is true, one thing is clear, the word "pattern" did not end up in the definition by mistake. The drafting record is replete with cost analyses. The legislature did not want to create provisions that would lead to unreasonable administrative costs. Limiting mismanagement claims to those where a "pattern" can

be shown would reduce enforcement costs and avoid a flood of frivolous complaints about one-time management errors.

¶ 54. We readily acknowledge that the purpose of the whistleblower law is to encourage employees to disclose certain information and protect such employees from retaliation. Wis. Stat. § 230.01(2). Limiting the meaning of "pattern" in the definition of mismanagement is not inconsistent with that purpose. The whistleblower provisions have built-in limitations designed to protect employees under certain circumstances.

¶ 55. Our conclusion that the Commission's interpretation is reasonable is supported by caselaw. In *Teamsters v. United States*, 431 U.S. 324, 336 (1977), the United States Supreme Court held that to show a "pattern" in the context of a discrimination claim under Title VII of the Civil Rights Act of 1964, the government had "to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." The Court quoted an explanation by Senator Humphrey: "single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice. . . . " *Id.* at 336 n.16 (internal quotation omitted).

¶ 56. Similarly, in interpreting a statute requiring a pattern of real estate sales be established, this court held: " 'Pattern' suggests that, even though one be in the business of selling, more than an isolated instance or two of selling must occur before a broker's license is required." *State ex rel. Real Estate Examining Bd. v. Gerhardt*, 39 Wis. 2d 701, 712, 159 N.W.2d 622 (1968).

¶ 57. Hutson's claim of an ongoing violation may also be viewed as an attempt to re-characterize the "management decision" at issue in this case. The Com-

645

mission interpreted the management decision as one act, a decision not to reduce the caseload. We agree with this characterization. Hutson's February 5 memo refers to one particular decision that she wanted changed. She believed the caseload exceeded the DOC's own limits and wanted it reduced or wanted to be paid overtime. Applying the "due weight" level of deference here, the Commission's interpretation is certainly at least as reasonable as that put forth by Hutson. As we have noted, if there are equally reasonable interpretations, the agency's interpretation will be upheld. *See UFE,* 201 Wis. 2d at 287 n.3.

### IV

¶ 58. Under the circumstances presented here, we conclude that a "pattern of incompetent management actions" under Wis. Stat. § 230.80(7) requires more than a claim of a single act of incompetent management. We find that Hutson's February 5 memo is not a disclosure of information protected under the whistleblower law, and for that reason, we reverse the decision of the court of appeals.

¶ 59. The Commission also requested this court to review the court of appeals' application of Wis. Stat. § 227.57(4) and Wis. Stat. § 752.35.[6] The court of appeals suggested that these statutes combined to allow

---

[6] Wisconsin Stat. § 227.57(4), dealing with a court's scope of review when examining an administrative agency decision, provides:

> The court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure.

for a court to send back a decision to an agency on "fundamental fairness" grounds. We agree with the Commission's argument that Wis. Stat. § 227.57(4) only allows remand in the event that an appellate court finds "that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure." In *Chicago and North Western Railroad v. LIRC,* 98 Wis. 2d 592, 612–13, 297 N.W.2d 819 (1980), this court explicitly held that the discretionary review statute "is not applicable to a judicial review under ch. 227." To the extent that the court of appeals implies a substantive ground for remanding a case to an administrative agency based on the language of Wis. Stat. § 227.57(4), we disagree. Wisconsin Stat. § 227.57(4) allows for remand on procedural grounds.

Wisconsin Stat. § 752.35, a statute allowing for discretionary reversal by the court of appeals, provides:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

It should be noted that there is almost identical language in Wis. Stat. § 751.06, which describes the supreme court's discretionary reversal authority. This, rather than Wis. Stat. § 752.35, was the statute referenced in *Chicago and North Western Railroad v. LIRC,* 98 Wis. 2d 592, 612–13, 297 N.W.2d 819 (1980).

¶ 60. For the foregoing reasons, we find that the court of appeals' decision should be reversed and the decision by the Commission upheld.

*By the Court.*—The decision of the court of appeals is reversed.