# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP671-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent, |
| | v. |
| | Keimonte Antonie Wilson, Sr., |
| | Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 371 Wis. 2d 564, 884 N.W.2d 534
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | June 22, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 17, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | William S. Pocan |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ZIEGLER, J. dissents, joined by GABLEMAN, J. |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs and oral argument by *Kaitlin A. Lamb*, assistant state public defender, and *Jorge R. Fragoso*, assistant State public defender.

For the plaintiff-respondent there was a brief by *Christopher G. Wren*, assistant attorney general, and *Brad D. Schimel,* attorney general, and an oral argument by *Jason A. Gorn*, assistant attorney general.

No. 2015AP671-CR

(L.C. No. 2013CF2103)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin**

      **Plaintiff-Respondent,**

      **v.**

**Keimonte Antonie Wilson, Sr.,**

      **Defendant-Appellant-Petitioner.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUN 22, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 ANN WALSH BRADLEY, J. Petitioner, Keimonte Antonie Wilson, Sr. ("Wilson"), seeks review of a court of appeals decision affirming a circuit court judgment of conviction and order denying his postconviction motion.[1] The court of appeals determined that the circuit court correctly interpreted the statutory procedure for subpoenaing witnesses in a criminal case. Additionally, it concluded that Wilson did not receive

_____

[1] State v. Wilson, No. 2015AP671-CR, unpublished slip op. (Wis. Ct. App. July 6, 2016) (affirming judgment and order entered by the circuit court for Milwaukee County, William S. Pocan, J., presiding).

ineffective assistance of counsel because he was not prejudiced by the failure to obtain a witness's testimony at a suppression hearing.

¶2 Wilson requests that this court reverse the court of appeals' decision and remand for an evidentiary hearing to take testimony on a material issue of fact from a key witness who failed to appear at the suppression hearing. He contends that the court of appeals erred in concluding that the witness was improperly served a subpoena. In the alternative, Wilson asserts that his trial counsel was ineffective for failing to argue that the service of the subpoena was proper, or alternatively, for failing to properly subpoena the witness.

¶3 Contrary to the court of appeals, we conclude that the circuit court erred in determining that Wilson improperly served a subpoena on the witness. Wilson complied with Wis. Stat. § 885.03 (2013-14), which allows service of a subpoena on a witness in a criminal case by leaving the subpoena at a witness's abode.[2] Because we determine that the subpoena was

---

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

properly served, we need not address the alternative argument asserting ineffective assistance of counsel.[3]

¶4 Accordingly, we reverse the court of appeals and remand to the circuit court for a continuance of the suppression hearing so that Wilson may present the testimony of the witness who failed to appear.

I

¶5 The initial material facts of this case are not in dispute. Wilson was charged with one count of possession with intent to deliver between five and fifteen grams of cocaine as a second offense.

¶6 According to the complaint, police officers observed a truck parked in a vacant lot near a "No Trespassing" sign. They saw Wilson get out of the truck and walk towards a known drug house. When Wilson reappeared and walked back towards the truck, he was approached by three officers. He allegedly consented to a search of his person, which resulted in the officers finding cocaine and cash.

¶7 Wilson filed a suppression motion, contending that there was no basis for the stop and that he had not consented to

---

[3] We need not determine whether Wilson received ineffective assistance of counsel because Wilson prevailed on his statutory interpretation argument. As Wilson's counsel explained at oral argument, his ineffective assistance of counsel claim was raised as an alternative argument if the court did not address the merits of Wilson's statutory claim. Because we determine that Wilson properly subpoenaed the witness and thus remand for an evidentiary hearing, we do not address the merits of Wilson's ineffective assistance of counsel claim.

the search. Accordingly, he argued that the evidence obtained from the search (three plastic bags allegedly containing cocaine and $449 in cash) must be suppressed. During the suppression hearing, a factual issue arose regarding whether the police officers had their guns drawn when they approached the truck and searched Wilson.

¶8 The police officers testified that that their guns were not drawn. For example, Officer Hunter testified:

Q: At any point in time prior to approaching the parked truck did you have your weapon drawn?

A: No.

Q: Did Officer Savagian have his weapon drawn did you see?

A: No.

. . .

Q: At any point of time in this encounter with either Darryl, the front seat passenger, or Mr. Wilson did any of the officers have their guns out?

A: No.

¶9 The defense called a witness who disputed the officers' account of events. Darryl Roberts, who was sitting in the truck with Wilson, testified that two "[o]fficers arrive[d] with their guns out." Roberts further testified that one officer opened the door, grabbed his arm, pulled him out of the truck and immediately searched him.

¶10 A second defense witness, Jacqueline Brown, failed to appear to testify at the hearing. Wilson's trial counsel observed that the affidavit of service indicated that Brown had

4

been served by leaving a copy of the subpoena with her daughter at their residence.[4] He proffered that if she were present, Brown would testify that she observed the officers with guns drawn approach the vehicle and take both Wilson and Roberts out of the vehicle.

¶11 As his counsel further explained, Brown received the subpoena and had notice of the hearing, but was unable to leave work to attend the hearing:

> She indicated to me she was at work and she was unable to get someone to cover her shift. The witness who did show up [Ms. Brown's son Darryl Roberts] brought us a letter from [Ms. Brown] indicating that she wasn't going to be able to attend today. My impression is, is that she's a necessary witness since there's some dispute here as to the conditions surrounding the stop. We do have a proper subpoena. I have an affidavit of service.

¶12 After Brown failed to appear at the hearing, defense counsel moved to adjourn the hearing in order to resubpoena Brown or proposed that Brown testify by phone. The State objected to having Brown testify by phone and instead suggested a body attachment. Defense counsel agreed with the State that a body attachment should be ordered.

¶13 The circuit court acknowledged that testimony regarding whether the officers had their guns drawn "does seem to be the issue in this case." It stated:

---

[4] In this case there is no dispute that the witness received notice of the hearing. At oral argument it was underscored that we need not address any concerns that may arise if a witness does not receive notice.

> As a practical matter if they came to the vehicle with guns ablaze, then we have a different issue because then the people in the car could have felt they were under arrest or——and didn't have any choice other than to be searched. So it's a key issue. It would seem to me it's the only key issue of all the testimony I've heard here today . . . .

Although Brown would have offered testimony on this key issue, the circuit court concluded that "the problem that I have here is that this is not a valid subpoena and I could not issue a body attachment based on this subpoena."

¶14 According to the circuit court, the service of the subpoena——an apparent single attempt that used substituted service——was inadequate. It reasoned that "you have to attempt on a couple of occasions and make reasonable efforts before you can serve by substitute service." The circuit court asked defense counsel and the State whether it was "wrong on the law" regarding service and both agreed that multiple attempts at personal service need to be made before substituted service may be used. Consequently, the circuit denied both the body attachment and the adjournment request.

¶15 The hearing continued without testimony from Brown. Wilson testified in his own defense that three officers ran up with their guns drawn:

> [The officer] had his gun and then he just start patting on me. And I'm looking dead at the gun. I'm like——'cause I'm scared. I'm like, oh, man, what's going on. . . .

¶16 However, the circuit court concluded that the police officers' testimony was more credible than was the testimony of

Roberts and Wilson. It addressed the absence of Brown's testimony, concluding that even if she had testified, this likely would not have assisted the court in its ruling on the motion because Roberts' and Wilson's testimony was inconsistent. The circuit court further determined there was reasonable suspicion to stop and consent to the search. It denied Wilson's motion to suppress.

¶17 Wilson subsequently pleaded guilty to one count of possession with intent to deliver between five and fifteen grams of cocaine. In exchange for Wilson's plea, the State dropped the repeater charge. The circuit court sentenced Wilson to five years of imprisonment.

¶18 Wilson filed a postconviction motion, arguing that the circuit court erroneously determined that service of the subpoena was inadequate. Additionally, he asserted that he received ineffective assistance of counsel because trial counsel failed to make an argument that the subpoena was properly served. In the alternative, he advances that if it is determined that the witness was improperly served, then trial counsel was ineffective for failing to ensure that service of the subpoena was properly executed.

¶19 The circuit court denied Wilson's postconviction motion without a hearing. The court of appeals affirmed the circuit court's judgment and order, concluding that the circuit court "properly interpreted the subpoena rules and that no prejudice has been shown from the failure to obtain the

7

witness's testimony." State v. Wilson, No. 2015AP671-CR, unpublished slip op., ¶1 (Wis. Ct. App. July 6, 2016).

II

¶20 We are asked to determine whether Wilson complied with the statutory procedure for serving a subpoena on a witness in a criminal case. Accordingly, we are called upon to interpret and apply relevant statutes. The interpretation of a statute presents a question of law that we decide independently of the decisions rendered by the circuit court and the court of appeals. State v. Harrison, 2015 WI 5, ¶37, 360 Wis. 2d 246, 858 N.W.2d 372.

¶21 Statutory interpretation begins with the language of the statute. State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We give statutory language its common, ordinary and accepted meaning, except that technical or specially-defined words are given their technical or special definitions. Id.

¶22 Statutory language is interpreted in the context in which it is used, in relation to the language of surrounding or closely-related statutes. Id., ¶46. Generally, "where a specific statutory provision leads in one direction and a general statutory provision in another, the specific statutory provision controls." Marder v. Bd. of Regents of Univ. of Wis. Sys., 2005 WI 159, ¶23, 286 Wis. 2d 252, 706 N.W.2d 110 (citation omitted).

¶23 If the meaning of a statute is clear, we may end our analysis. However, legislative history and other authoritative

8

sources may be consulted to confirm a plain meaning interpretation.  <u>Kalal</u>, 271 Wis. 2d 633, ¶51.

III

¶24  At issue in this case is the procedure for service of a subpoena on a witness in a criminal case.  The parties present for our examination four Wisconsin statutes addressing the requirements for service of subpoenas.  We begin by setting forth the four statutes and then examine how the statutes interface one with the other.

¶25  Wilson focuses our attention and relies on two statutes, Wis. Stat. §§ 972.11 and 885.03.  Chapter 972 Wis. Stats. is entitled Criminal Trials and within that chapter Wilson points to Wis. Stat. § 972.11 (Evidence and practice; civil rules applicable).  It states that Chapter 885 shall apply in all criminal proceedings:

> (1) Except as provided in subs. (2) to (4), the rules of evidence and practice in civil actions shall be applicable in all criminal proceedings unless the context of a section or rule manifestly requires a different construction. . . . Chapters 885 to 895, except ss. 804.02 to 804.07 and 887.23 to 887.26, shall apply in all criminal proceedings.

Wis. Stat. § 972.11(1).

¶26  Accordingly, we turn next to the second statute Wilson advances.  It is located in Chapter 885 ("Witnesses and Oral Testimony"), a Chapter apart from either the criminal or civil rules of procedure.  Within the Chapter lies Wis. Stat. § 885.03 (Service of Subpoena), which provides three methods for serving a subpoena, including by leaving a copy at the witness's abode:

9

> Any subpoena may be served by any person by exhibiting and reading it to the witness, or by giving the witness a copy thereof, or by leaving such copy at the witness's abode.

¶27 The State on the other hand asks us to focus primarily on two statutes that are set forth in the civil rules of procedure, Wis. Stat. §§ 805.07 and 801.11. The former also incorporates Chapter 885.

¶28 Wisconsin Stat. § 805.07 (Subpoena) states that a subpoena generally may be served in accordance with Chapter 885. However, by reference to Wis. Stat. § 801.11(1)(b), it excepts from that general premise the manner in which substituted personal service of a witness subpoena must be accomplished. Wis. Stat. § 805.07 provides:

> (1) ISSUANCE AND SERVICE. Subpoenas shall be issued and served in accordance with ch. 885. A subpoena may also be issued by any attorney of record in a civil action or special proceeding to compel attendance of witnesses for deposition, hearing or trial in the action or special proceeding.
> . . . .
>
> (5) SUBSTITUTED SERVICE. A subpoena may be served in the manner provided in s. 885.03 except that substituted personal service may be made only as provided in s. 801.11(1)(b) and except that officers, directors, and managing agents of public or private corporations or limited liability companies subpoenaed in their official capacity may be served as provided in s. 801.11(5)(a).

¶29 Pursuant to the rules of civil procedure, Wis. Stat. § 801.11 ("Personal jurisdiction, manner of serving summons for") sets forth the manner for substituted personal service of a summons on a defendant. Section 801.11 states:

10

A court of this state having jurisdiction of the subject matter and grounds for personal jurisdiction as provided in s. 801.05 may exercise personal jurisdiction over a defendant by service of a summons as follows:

(1) NATURAL PERSON. Except as provided in sub. (2) upon a natural person:

(a) By personally serving the summons upon the defendant either within or without this state.

(b) If with reasonable diligence the defendant cannot be served under par. (a), then by leaving a copy of the summons at the defendant's usual place of abode:

1. In the presence of some competent member of the family at least 14 years of age, who shall be informed of the contents thereof;

1m. In the presence of a competent adult, currently residing in the abode of the defendant, who shall be informed of the contents of the summons; or

2. Pursuant to the law for the substituted service of summons or like process upon defendants in actions brought in courts of general jurisdiction of the state in which service is made.

. . .

When read together with Wis. Stat. § 805.07, these two rules of civil procedure instruct that substituted service may be used to serve a subpoena only if after reasonable diligence a witness cannot be personally served.

IV

¶30 As <u>Kalal</u> instructs, we begin our statutory interpretation with the language of the statute. 271

11

Wis. 2d 633, ¶45. We focus first on Wis. Stat. § 972.11(1), which is part of the criminal procedure statutes. It initially provides that "the rules of evidence and practice in civil actions shall be applicable in all criminal proceedings unless the context of a section or rule manifestly requires a different construction." However, it subsequently references Chapter 885, which governs the service of subpoenas. Section 972.11(1) expressly provides that "Chapter[s] 885 to 895 . . . shall apply in all criminal proceedings." Therein lies the rub. Which part of Wis. Stat. § 972.11 directs our inquiry? The answer will determine whether reasonable diligence was required here.

¶31 The State points initially to Wis. Stat. § 972.11, emphasizing the portion of its text that sets forth the general premise that the rules of practice in civil actions shall be applicable in criminal proceedings unless context clearly requires otherwise.

¶32 It asserts that the civil statutes Wis. Stat. §§ 805.07(5) and 801.11 control here and that their context does not require a different construction. The State explains that although Wis. Stat. § 801.11(1)(b) is the statute governing the service of a summons in civil actions, its procedure for substituted service is incorporated by Wis. Stat. § 805.07(5) as the procedure for serving a subpoena in a civil action. See Wis. Stat. § 805.07(5) ("A subpoena may be served in the manner provided in s. 885.03 except that substituted personal service may be made only as provided in s. 801.11(1)(b) . . . .").

12

¶33 In a civil action, a subpoena may be left at a witness's residence only if, with "reasonable diligence" the defendant cannot be personally served. Wis. Stat. § 801.11(1)(b). In such a case, it may be left with a competent family member at least 14 years of age or in the presence of a competent adult currently residing in the abode of the defendant. Wis. Stat. § 801.11(1)(b)1.-1m. Accordingly, the State maintains that the subpoena was not properly served because Wilson did not satisfy the reasonable diligence requirements when he used substituted service after only one attempt at personal service.

¶34 Admittedly, Wis. Stat. § 972.11(1) points us in two different directions. On the one hand, the rules of civil procedure are applicable generally to criminal proceedings unless the context of a section or rule requires a different construction. The application of the rules of civil procedure mandates reasonable diligence for substituted service of a subpoena. On the other hand, Chapter 885 is to apply in all criminal proceedings and within that chapter lies Wis. Stat. § 885.03 that sets forth three manners for service of a subpoena that do not include the reasonable diligence mandate.

¶35 We find guidance in this court's prior instruction that "where a specific statutory provision leads in one direction and a general statutory provision in another, the specific statutory provision controls." Marder, 286 Wis. 2d 252, ¶23, 706 N.W.2d 110 (citation omitted); see also

13

State v. Schaefer, 2008 WI 25, ¶47, 308 Wis. 2d 279, 746 N.W.2d 457.

¶36 Because Wis. Stat. § 972.11(1) explicitly references Chapter 885, it is the more specific textual provision. In contrast, the rules of civil procedure are only generally applied to criminal cases through Wis. Stat. § 972.11(1). Thus, service of a witness subpoena in a criminal proceeding is controlled by Wis. Stat. § 885.03, rather than by the rules of civil procedure.

¶37 The plain language of Wis. Stat. § 885.03 sets forth the procedures for serving a subpoena on a witness in a criminal proceeding. It provides only that "[a]ny subpoena may be served by any person by exhibiting and reading it to the witness, or by giving the witness a copy thereof, or by leaving such copy at the witness's abode." Wis. Stat. § 885.03.

¶38 We turn next to the legislative history of the civil and criminal subpoena statutes to confirm our plain meaning interpretation of the statute. Kalal, 271 Wis. 2d 633, ¶51. More specifically, we observe that when the civil subpoena statutes were amended to incorporate a "reasonable diligence" requirement, the criminal subpoena statutes remained unchanged.

¶39 In the 1970s, as part of a revision to Wisconsin's civil procedure code, the legislature enacted Wis. Stat. § 805.07(5), which incorporates Wis. Stat. § 801.11(1)(b) and its "reasonable diligence" standard. See Wis. Stat. § 805.07(5) (1975-76) (effective Jan. 1, 1976); Rules of Civil Procedure Committee 1970-1978.

14

¶40 At the time that Wis. Stat. § 805.07(5) was enacted, the legislature did not alter Wis. Stat. § 885.03. If the legislature intended Wis. Stat. § 805.07(5) to apply to criminal proceedings, it could have repealed Wis. Stat. § 885.03 and thus removed the option of service by leaving a copy of the subpoena at the witness's abode. It did not. Alternatively, at the time that Wis. Stat. § 805.07(5) was enacted, it could have amended Wis. Stat. § 885.03 to include a "reasonable diligence" requirement or to include a reference to Wis. Stat. §§ 805.07 or 801.11. It did neither. In 1993, the legislature last took the opportunity to amend Wis. Stat. § 885.03 and there yet remains no reference to either reasonable diligence or Wis. Stat. § 801.11(1).[5]

¶41 In contrast, in 2010 when it amended Chapter 968, which governs the commencement of criminal proceedings, the legislature specifically referenced Wis. Stat. § 801.11. In amending the chapter, it created Wis. Stat. § 968.375(5) (governing subpoenas and warrants for records or communications of customers of an electronic communication service or remote computing service provider). It provides that "[a] subpoena or warrant issued under this section may be served in the manner provided for serving a summons under s. 801.11(5) . . ." Wis. Stat. § 968.375(5).

_____

[5] The 1993 amendment changed the statute to make it gender neutral, but otherwise did not alter the statute.

15

¶42 If Wis. Stat. § 801.11 already applied to criminal cases, it would be unnecessary to specifically reference this civil statute in Wis. Stat. § 968.375(5). We should not interpret a statute in a way that renders a portion of it superfluous. Hutson v. State of Wis. Pers. Comm'n, 2003 WI 97, ¶49, 263 Wis. 2d 612, 665 N.W.2d 212 (quoting Kollasch v. Adamany, 104 Wis. 2d 552, 563, 313 N.W.2d 47 (1981)) ("When construing statutes, meaning should be given to every word, clause and sentence in the statute, and a construction which would make part of the statute superfluous should be avoided wherever possible."). If we were to conclude that Wis. Stat. § 801.11 already applied to the service of a subpoena in all criminal cases, the language incorporating it into Wis. Stat. § 968.375 would be rendered superfluous.

¶43 This court's decision in State v. Popenhagen, 2008 WI 55, 309 Wis. 2d 601, 749 N.W.2d 611, also informs our analysis. In Popenhagen, the State obtained documents in a criminal case with subpoenas issued pursuant to Wis. Stat. § 805.07. Id., ¶¶7-8. The parties agreed that the State erred in issuing the subpoenas pursuant to Wis. Stat. § 805.07 because it should have followed the procedure set forth in the criminal statutes. Id., ¶10.

¶44 The Popenhagen court determined that the documents obtained with the subpoena must be suppressed because otherwise the safeguards established by the criminal statutes regarding the service of subpoenas would be rendered meaningless. Id., ¶71. The concurrence in Popenhagen pointedly explained, "[t]he

16

criminal law has its own subpoena statutes . . . The Wisconsin criminal code specifically provides that Chapter 885, Witnesses and Oral Testimony, 'shall apply in all criminal proceedings.'" Id., ¶¶138-39 (Ziegler, J., concurring) (quoting Wis. Stat. § 972.11(1)).   Likewise, the Popenhagen concurrence correctly observed that Wis. Stat. § 805.07 is "a civil subpoena statute meant for civil litigants." Id., ¶141.

¶45  Our interpretation that Wis. Stat. § 885.03  provides the procedure for serving a  witness subpoena in a criminal case appears to be well established.  Indeed, the Wisconsin Criminal Practice & Procedure Handbook, in both its first and second editions, instructs that service of a subpoena may be accomplished "simply by . . . leaving a copy of it at the witness's residence."  Christine M. Wiseman, Nicholas L. Chiarkas, & Daniel D. Blinka, 9 Wis. Practice:  Criminal Practice and Procedure § 24.11 (1996); Christine M. Wiseman and Michael Tobin, 9 Wis. Practice:  Criminal Practice & Procedure § 24.13 (2016).

¶46  Thus, although both the civil and criminal procedures statutes incorporate Wis. Stat. § 805.03, they do so differently.  In the civil context, Wis. Stat. § 885.03 is modified by Wis. Stat. §§ 805.07 and 801.11 by providing for substituted service premised on a reasonable diligence requirement.  However, in the criminal context, the procedures set forth in Wis. Stat. § 885.03 are unaltered.  It sets forth three manners of service of a witness subpoena (by exhibiting and reading it to the witness, giving the witness a copy, or by

17

leaving it at the witness's abode) and no reasonable diligence is mandated. Accordingly, we determine that the procedures set forth in Wis. Stat. § 885.03 govern the service of a witness in a criminal proceeding.

¶47 This does not mean, however, that a party is precluded from employing substituted service with reasonable diligence. In many circumstances it may appear to be the prudent way to proceed. However, the statute as written does not mandate it.[6]

¶48 We turn now to examine whether the service of the subpoena in this case was done in accordance with Wis. Stat. § 885.03. It is undisputed that Wilson served the witness with a subpoena by leaving it at the witness's abode with her daughter. When the witness failed to appear to testify at the hearing, defense counsel moved to adjourn the hearing in order to resubpoena the witness. The State suggested, and defense counsel agreed, that the court issue a body attachment.

¶49 After reviewing the subpoena, however, the circuit court concluded that its service was inadequate. It reasoned that "you have to attempt on a couple of occasions and make reasonable efforts before you can serve by substitute service." The circuit court proceeded to ask defense counsel and the State whether it was "wrong on the law" regarding service. Both agreed that the court was correct that multiple attempts at

---

[6] Additionally, we observe that a circuit court retains discretion to issue a body attachment. Pursuant to Wis. Stat. § 885.11(2), for an attachment to issue there must have been an "unexcused failure to appear."

18

personal service must be made before leaving a subpoena at a witness's abode.

¶50 The circuit court concluded that "the problem that I have here is that this is not a valid subpoena and I could not issue a body attachment based on this subpoena." It denied both the body attachment and refused to adjourn the hearing so that the witness could be resubpoenaed. The circuit court erred, because as set forth above, Wilson complied with Wis. Stat. § 885.03, which allows service of a subpoena on a witness in a criminal case by leaving the subpoena at a witness's abode.

¶51 Finally, we pause briefly to discuss Wilson's ineffective assistance of counsel claims. Wilson asserts that his trial counsel was ineffective for failing to argue that the service of the subpoena was proper, or alternatively, for failing to properly subpoena the witness.[7] He further contends

---

[7] Wilson argues in his brief that if the court finds he forfeited the argument that Brown was properly subpoenaed, it should address his ineffective assistance of counsel claims.

(continued)

19

that at the suppression hearing he was prejudiced by the absence of the testimony of a key witness.

¶52 In order to succeed on an ineffective assistance of counsel claim, a defendant must show both: (1) that his counsel's representation was deficient; and (2) that this deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 687 (1984). To show prejudice, a defendant must demonstrate that there is "a reasonable probability that, but

---

Generally, issues not raised or considered by the circuit court will not be considered for the first time on appeal. State v. Holland Plastics Co., 111 Wis. 2d 497, 504, 331 N.W.2d 320 (1983). However, it is within this court's discretion to disregard alleged forfeiture and consider the merits of any issue because the rule of forfeiture is one of judicial administration and not of power. See, e.g., State v. Beamon, 2013 WI 47, ¶49, 347 Wis. 2d 559, 830 N.W.2d 681; State ex rel. Universal Processing Serv. of Wis., LLC v. Cir. Ct. of Milwaukee Cty., 2017 WI 26, ¶53, 374 Wis. 2d 26, 892 N.W.2d 267 ("Rules of forfeiture and waiver are rules of judicial administration, and thus, a reviewing court may disregard a waiver or forfeiture and address the merits of an unpreserved issue in an appropriate case."); D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson, 2008 WI 126, ¶41, 314 Wis. 2d 560, 757 N.W.2d 803 (we may address a forfeited issue at our discretion when we deem it important).

Although trial counsel did not object to the circuit court's ruling that Brown was not properly subpoenaed, we decline to apply the forfeiture rule here. The dissent contends that application of the forfeiture rule is appropriate to avoid a strategy in which trial counsel fails to object for strategic reasons. However, there is no evidence that counsel failed to object for strategic reasons in this case.

Additionally, the argument raised on appeal has been briefed and argued by both parties. Accordingly, we choose to address Wilson's argument set forth above in order to clarify the important issue of law that is presented in this case.

for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

¶53 We need not determine whether Wilson received ineffective assistance of counsel because Wilson prevailed on his statutory interpretation argument. As Wilson's counsel explained at oral argument, his ineffective assistance of counsel claim was raised as an alternative argument if the court did not address the merits of Wilson's claim. Because we determine that Wilson properly subpoenaed the witness and remand for an evidentiary hearing, we do not address Wilson's ineffective assistance of counsel claim.

V

¶54 In sum, we conclude that the circuit court erred in determining that Wilson improperly served a subpoena on the witness. Wilson complied with Wis. Stat. § 885.03, which allows service of a subpoena on a witness in a criminal case by leaving the subpoena at a witness's abode. Because the subpoena was properly served, we reverse the court of appeals and remand to the circuit court for a continuance of the suppression hearing so that Wilson may take the witness's testimony.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.

¶55 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting)*. Even if, as the court today concludes, the circuit court below erred in its assessment of the validity of the subpoena of Jacqueline Brown ("Brown"), Keimonte Antonie Wilson, Sr. ("Wilson") failed to object to that error. Under well-established precedent, Wilson therefore forfeited the right to direct review of the alleged error and this court will only inquire into whether Wilson's counsel was constitutionally ineffective in neglecting to challenge the circuit court's ruling on the subpoena. See, e.g., State v. Erickson, 227 Wis. 2d 758, 765-67, 596 N.W.2d 749 (1999).

¶56 Unfortunately, I must dissent because the court deviates from this "normal procedure in criminal cases," analyzing Wilson's claim on the merits without adequate justification. Id. I would adhere to precedent and analyze whether Wilson received the effective assistance of counsel. I conclude that Wilson's ineffective assistance of counsel claim fails because he has not demonstrated that he was prejudiced by his counsel's performance. Suppression would have occurred with or without Brown's testimony, and the decision of the court of appeals should be affirmed. Accordingly, I respectfully dissent.

I

¶57 This case arose following an incident on May 2 or 3, 2013,[1] in Milwaukee, Wisconsin, during which Wilson was seen

---

[1] There is a discrepancy in the record regarding the date of the incident.

exiting an alleged "known and active drug house" and was searched by a Milwaukee police officer; the officer found suspected crack cocaine on his person. On May 8, 2013, a criminal complaint was filed against Wilson in Milwaukee County circuit court charging him with one count of possession with intent to deliver a controlled substance (cocaine) in the amount of between 5 to 15 grams, second and subsequent offense, in violation of Wis. Stat. § 961.41(1m)(cm)2. See also Wis. Stat. § 961.48(1)(b).

¶58 On June 24, 2013, Wilson filed a motion to suppress evidence of the crime. On December 3, 2013, a hearing was held on the motion. The first to testify was Officer William Savagian ("Officer Savagian") of the Milwaukee Police Department. Officer Savagian testified that on May 2, 2013, at about 7:00 p.m., he and his two partners——one male, one female—— were in the area of West Meinecke Avenue and North 18th Street in the City of Milwaukee. Officer Savagian had worked in this particular area for over seven years. Officer Savagian was parked on the street "to conduct followup on a reckless endangering safety complaint" when he saw Wilson exit a red sport utility vehicle ("SUV") and walk into the back yard of a "known and active drug house." The SUV was "more or less parked behind the house in . . . what almost was like a vacant field." There was a sign in the field that read "no parking, dumping or trespassing."

¶59 Officer Savagian lost sight of Wilson for "not more than 15, 20 seconds," after which he saw Wilson walk back to his

2

vehicle and reenter it. At that time Officer Savagian and one of his partners, Officer James Hunter ("Officer Hunter"), were already in the process of approaching the SUV.[2] According to Officer Savagian, his speed was a "normal walk" and the officers' guns were not drawn. Officer Savagian walked up to the driver's side door, which Wilson opened. Officer Hunter went to the passenger side of the vehicle. There was one additional individual in the front passenger seat.

¶60 Officer Savagian testified that he believed he would have identified himself as a police officer. He then asked Wilson if he had any drugs or firearms on his person. Wilson responded in the negative, exited the vehicle without being asked, stuck his arms out "like an airplane" and told Officer Savagian he could search Wilson.[3] Officer Savagian stated that Wilson was "shaking" and his eyes "became real wide," "[w]ider than I guess normal people -- or someone that is scared would look."

---

[2] Officer Savagian was not aware of the position of the third, female officer at this point in time.

[3] Officer Savagian testified, "I don't know if that was his exact words, but it was -- him stepping out with his arms raised was implied." Pressed on this point on cross-examination, Officer Savagian elaborated:

> Yes, he did say I could search him. I don't know if he -- what I meant to say, the exact wording of that, but his arms extended obviously implies more of a willingness to search and there was never a like, ["]hey, I don't want you to search me["] or any kind of -- he never stopped the search either.

¶61 Officer Savagian asked Wilson, "[']If I do search you, am I going to find anything on you[?']" Wilson replied "no." With his arms still out, Wilson informed Officer Savagian that he was on probation. Officer Savagian asked whether it was "for drugs or guns," and Wilson "indicated that it was for drugs." Officer Savagian searched Wilson and found, among other things, "a plastic sandwich bag" containing "three individually bagged up . . . chunks of this white chunky substance"——"suspected crack cocaine." Officer Savagian gave the substance to one of his partners and told Wilson he was going to be handcuffed.

¶62 After Officer Savagian's testimony at the hearing, the defense called Darryl Roberts ("Roberts"). Roberts testified that Wilson was a friend of his as well as Roberts' sister's boyfriend. On the date and at the time in question, Roberts was sitting in the front passenger seat of a "truck" with Wilson. Roberts denied that the lot was vacant, stating, "[i]t's our yard."[4] Wilson was "talking to [Roberts] about school." Wilson received a call from his father and then stepped out of the vehicle to go to his father's house. About five minutes later, Wilson returned to the vehicle, whereupon three officers arrived and ordered Wilson and Roberts out of the vehicle. In Roberts' telling, two of the officers, both male, had "their guns out." One of the male officers was on the driver's side of the vehicle "pointing the gun at" Wilson. Roberts agreed that the officer "had both hands on the gun" and the gun was "pointed out

_____

[4] Roberts testified that he lived on West Meinecke.

4

directly in front of him." The other male officer "was coming to the passenger side with his gun drawn telling [Roberts] to get out of the car." That officer was holding his gun in the same way as the other officer.

¶63 Wilson and Roberts exited the vehicle; Roberts testified that the officer put his gun back into its holster, "grabbed [his] arm" and then Roberts "stepped out." Without being asked, Roberts was immediately searched. The officer asked Roberts if he had "anything illegal on [him]," and Roberts replied that he did not. Meanwhile the female officer was "walking around the premises" and "[s]earching around the truck."

¶64 After Roberts testified, Wilson's attorney explained that one of the defense witnesses, Brown, had not "responded to the subpoena by attending"; Brown was "at work" and "couldn't find anybody to cover her shift." Wilson's attorney informed the court:

> [I]t's my understanding that if she were to testify, she would be testifying that she was at the residence at the time that the police came to the what is essentially the back of her residence. It's my understanding that she would testify that she observed them with guns drawn approach the vehicle and take both my client and her son, [Roberts], out of the vehicle. And I don't want to presume too much on the testimony, but it's my understanding that that is very clearly what she would be testifying to.

¶65 Wilson's attorney stated that he was "wondering if the Court may be willing to grant one adjournment for the taking of [Brown's] testimony." The State took no position on the matter. The circuit court commented:

5

> The issue is . . . do we need to have a body attachment and have her brought to continue this hearing. . . . [I]f I'm going to set another date, she's going to be picked up with a warrant . . . . I'm not going to set another date and then hope that this time she decides to come.

¶66 In considering whether to issue a body attachment or whether to proceed without Brown, the circuit court remarked that the manner in which the officers approached the vehicle seemed to be "the only key issue of all the testimony" thus far. The State then took the position that the circuit court should issue a body attachment. Wilson's attorney began to suggest that perhaps the circuit court could call Brown to have her come into court. The circuit court rejected this approach: "I don't cajole witnesses to come to my court. There will be a body attachment." Shortly thereafter Wilson's attorney stated, "Judge, I hate to make the request, but I think that I have no other choice but to ask that the Court issue a body attachment."

¶67 The circuit court asked to see the subpoena. However, upon examination, the circuit court concluded that the subpoena was not valid and that an attachment could not be issued after all. The circuit court commented: "It looks like [the subpoena] was only served once and it was served by substituted service, and . . . under Wisconsin law, you have to attempt on a couple of occasions and make reasonable efforts before you can serve by substituted service." The circuit court then questioned Wilson's attorney and received the following answer:

> THE COURT: . . . [D]o you have -- do you believe that I'm wrong on the law?
>
> [WILSON'S ATTORNEY]: I don't have any reason to challenge the court on the law.

6

Consequently, the hearing proceeded without Brown's testimony.

¶68 Wilson testified next. Wilson stated that on May 2, 2013, at about 7:00 p.m. to 7:30 p.m., he was "parked in back of [his] [girlfriend's] house -- mother's house" and that Roberts was with him. Wilson denied being parked in the vacant lot. Wilson left to urinate in his father's back yard and returned to the vehicle "probably like less than a minute" later. Upon his return, Wilson saw "three officers running up with their guns pointed at -- in [his] direction." The officers were running at a "medium jog," and all three officers had their guns out and "pointed." According to Wilson, the female officer was running behind the two male officers. One officer went to the driver's side of the vehicle and another went to the passenger's side of the vehicle. An officer told Wilson to get out of the truck. Wilson testified that he did not at first realize that the officers were officers because they were in plain clothes. Wilson was scared and got out of the car because he thought the officers were going to shoot and because he did not know what was going on.

¶69 Once Wilson was out of the car, one of the officers stated that the officers were "Milwaukee police." Wilson did not offer to be searched, but an officer started patting him down with one hand and with his gun out and pointed at Wilson in the other hand. Wilson saw a bulletproof vest on the officer. The officer asked Wilson where he was coming from, and Wilson explained that he was coming from his father's house. The officer asked whether Wilson was on probation, and Wilson

7

explained that he was. When asked why he was on probation, Wilson answered that he was on probation "for drugs." Wilson testified that he stutters when is he is scared, and that he was stuttering at the time. Wilson had his arms raised up in the air (as opposed to "like an airplane") and felt he had "no choice" but to let the officer reach into his pocket. Wilson was eventually handcuffed. The officer never stated aloud that he had found anything on Wilson's person. Besides this testimony, evidence was introduced at the hearing that Wilson had three prior convictions.

¶70 The State called Officer Hunter as a rebuttal witness. Officer Hunter's testimony was similar to Officer Savagian's except that Officer Hunter testified that Wilson was away from his vehicle for approximately, and no more than, ten minutes and that Officer Griffin walked toward the vehicle with Officer Savagian and Officer Hunter. The following exchange occurred during Officer Hunter's testimony:

> Q: At any point in time prior to approaching the parked truck did you have your weapon drawn?
>
> A: No.
>
> Q: Did Officer Savagian have his weapon drawn did you see?
>
> A: No.
>
> Q: Officer Griffin?
>
> A: No.
>
> . . . .
>
> Q: At any point of time in this encounter with either [Roberts] . . . or Mr. Wilson did any of the officers have their guns out?

8

A: No.

¶71 Finally, the State called Officer Savagian back to the stand. The following exchange occurred:

Q: At any point in time during the apprehension of Mr. Wilson, either before, during or after the apprehension of Mr. Wilson, did you draw your service weapon?

A: I did not.

Q: Did you see either Officer Griffin or Officer Hunter draw their weapons?

A: I did not.

Q: On that day . . . do you recall whether or not you were wearing a [bulletproof] vest?

A: I was not. . . .

Q: Have you conducted a -- in your career as a Milwaukee police officer, have you ever conducted a search of a person by holding a gun in your hand and searching with your other hand?

A: I have; however, it's only under the most like high intense moments. Maybe you are making an entry on a warrant and someone runs at you and you just pat him down. It's -- it's under the most duress situation you could be in. It's not ideal at all.

On cross-examination, Officer Savagian agreed that he did not actually know whether Officer Griffin drew her gun or not since she was not in his line of vision after the three exited their vehicle, but added that "she wasn't anywhere around" Officer Savagian and Officer Hunter.

¶72 The circuit court denied Wilson's motion to suppress, concluding that the officers' interaction was supported by reasonable suspicion and that the search of Wilson was consensual. The court explained that it had had "the

9

opportunity to hear the testimony and assess the demeanor and . . . believability of the witnesses." It concluded that "regarding this gun situation" it found "the officers' testimony to be much more credible and believable than Mr. Wilson and Mr. Roberts. [Es]pecially given the inconsistencies between the testimony of Mr. Wilson and Mr. Roberts."

¶73 The court stated that it found Officer Savagian to be a "very credible witness." With regard to the search of Wilson, the court noted that Officer Savagian had testified that searching with a gun in one hand was reserved for a "very unusual high stress situation," and that although "high stress is a relative term," "for police officers doing this sort of work every day, this is hardly a high stress time what was described to me here." Additionally, while Officer Savagian "testified with a detailed recollection of what was said and what was offered" at the time of the search, Wilson simply testified "that he did not offer to let the officers search him."

¶74 The court also found Officer Hunter to be "very believable," "very calm as he testified," and "very clear that none of the officers had their guns drawn": "Not only what he was saying, but basically the way he was saying it led me to believe that he was true -- that he was telling the truth. And he was not in the courtroom when the other witnesses were testifying regarding the guns."

¶75 The court found less credible a number of other aspects of the testimony of Roberts and Wilson, such as the way

10

the officers were allegedly carrying their guns, the account of Roberts being pulled out of the car, and the notion that Officer Griffin would have approached the SUV with her gun pointed while behind the other two officers. The court also noted that Roberts was "very specific that only two of the officers had their guns out." The court stated:

> At the end of the day, I find Officer Savagian's explanation much more credible as to -- rather than this sort of A-Team paramilitary attack on the car by three officers, especially with the third officer basically having her gun at her colleague's heads which I didn't find to be credible . . . .

The court observed that "under these circumstances, there was no testimony really other than Mr. Wilson who unfortunately has been convicted of a crime three times, so his credibility is somewhat at issue. Plus he has a vested interest in this case."

¶76 The court also remarked that it did not "see at the end of the day how [Brown's testimony] would have assisted the Court or assisted Mr. Wilson with his motion." The court explained that while "it would be one thing if both Mr. Roberts and Mr. Wilson had testified totally consistently," they had not done so. Consequently, Brown would either have been "backing one or the other or maybe providing yet an additional explanation."

¶77 On December 23, 2013, Wilson pleaded guilty to one count of possession with intent to deliver a controlled substance (cocaine) in the amount of greater than 5 to 15 grams.[5] A judgment of conviction was entered, and the circuit court

---

[5] The second and subsequent enhancer was dropped.

11

sentenced Wilson to three years of initial confinement and two years of extended supervision.

¶78 On January 6, 2015, Wilson filed a motion for postconviction relief. On March 12, 2015, the circuit court denied the motion. On April 1, 2015, Wilson filed a notice of appeal. On July 6, 2016, the court of appeals affirmed the judgment of conviction and the circuit court's order denying Wilson's motion for postconviction relief. State v. Wilson, No. 2015AP671-CR, unpublished slip op. (Wis. Ct. App. July 6, 2016) (per curiam). On August 4, 2016, Wilson filed a petition for review in this court. On October 11, 2016, this court granted the petition.

II

¶79 The issues raised on this appeal pertain to the circuit court's ruling that the subpoena of Brown was not valid. But Wilson's attorney was asked by the circuit court point-blank if he wished to object to the circuit court's ruling on the subpoena, and the attorney declined to do so. "The absence of any objection warrants that we follow 'the normal procedure in criminal cases,' which 'is to address waiver within the rubric of the ineffective assistance of counsel.'" State v. Carprue, 2004 WI 111, ¶47, 274 Wis. 2d 656, 683 N.W.2d 31 (quoting Erickson, 227 Wis. 2d at 766).

¶80 Put differently, the court today validates Wilson's approach of: (1) consenting to the circuit court's ruling on the subpoena at the suppression hearing; (2) waiting to see if he succeeded on his motion to suppress; and (3) only after losing

12

that motion, objecting to the court's ruling on the subpoena. See, e.g., Erickson, 227 Wis. 2d at 766 ("If the waiver rule did not exist, a party could decline to object for strategic reasons and raise the error only when that party needed an advantage at some point in the trial."); State v. Caban, 210 Wis. 2d 597, 600, 611, 563 N.W.2d 501 (1997) (defendant waived issue of probable cause to search a vehicle by failing to raise the issue before the circuit court). On the other hand, Wilson is not without a remedy. He possesses state and federal constitutional rights to the effective assistance of counsel and may challenge the performance of his attorney in failing to object to the court's ruling on the subpoena. See, e.g., State v. Thiel, 2003 WI 111, ¶18, 264 Wis. 2d 571, 665 N.W.2d 305 (citing U.S. Const. amends. VI, XIV; Wis. Const. art. I, § 7); Erickson, 227 Wis. 2d at 766. I now conduct our well-established ineffective assistance inquiry, and conclude that Wilson's ineffective assistance of counsel claim fails because he was not prejudiced by his counsel's performance.

III

¶81 "Whether a convicted defendant received ineffective assistance of counsel is a two-part inquiry. First, the defendant must prove that counsel's performance was deficient. Second, if counsel's performance was deficient, the defendant must prove that the deficiency prejudiced the defense." State v. Carter, 2010 WI 40, ¶21, 324 Wis. 2d 640, 782 N.W.2d 695 (citations omitted). Relevant to this case, "there is no reason for a court deciding an ineffective assistance claim to approach

13

the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. 668, 697 (1984).

¶82 Assuming that, as the court today holds, the circuit court below erred in its assessment of the validity of the subpoena under review, I conclude that it is unnecessary to determine whether Wilson's attorney performed deficiently in failing to object to the court's ruling. This is so because even if the attorney performed deficiently, that deficiency did not prejudice Wilson.

¶83 To show prejudice Wilson must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Carter, 324 Wis. 2d 640, ¶37 (quoting Strickland, 466 U.S. at 694). Wilson must "offer more than rank speculation to satisfy the prejudice prong." Erickson, 227 Wis. 2d at 744. He cannot meet this burden.

¶84 The circuit court made clear that it found Officer Savagian and Officer Hunter to be highly credible witnesses and found their "testimony to be much more credible and believable than Mr. Wilson and Mr. Roberts." The circuit court was aware that Brown would likely testify that she saw the police officers approach the SUV with guns drawn and take Wilson and Roberts out of the car, but this did not change its findings at the conclusion of the suppression hearing. The circuit court simply did not consider a "sort of A-Team paramilitary attack on the car" likely under the circumstances.

14

¶85 Additionally, as the circuit court noted, Wilson and Roberts were not consistent in their testimony. Thus, had Brown testified, her testimony likely would have been inconsistent with either Wilson's account, Roberts' account, or both. For example, Wilson testified that all three officers had their guns drawn as they approached the SUV, while Roberts was "very specific that only two of the officers had their guns out." Perhaps Brown would have testified that two officers had drawn their guns. Perhaps Brown would have testified that three officers had drawn their guns. Or perhaps Brown would have provided a new version of events. Regardless, nothing but "rank speculation" supports the conclusion that Brown would have provided an account so credible——despite being inconsistent with either Wilson's testimony, Roberts' testimony, or both——that the circuit court would have immediately dismissed the testimony of Officer Savagian and Officer Hunter and suppressed the challenged evidence. Indeed, this would be highly unlikely: on top of the circuit court's extensive findings regarding the relative credibility of Officer Savagian, Officer Hunter, Roberts, and Wilson, Brown would have been starting at a disadvantage from a credibility perspective; as Roberts' mother, she obviously had an interest in the case.

¶86 Thus, assuming the circuit court should have obtained Brown's testimony and that Wilson's attorney was deficient in failing to object to the circuit court's actions, Wilson has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

15

would have been different." Carter, 324 Wis. 2d 640, ¶37 (quoting Strickland, 466 U.S. at 694). His ineffective assistance claim fails.

IV

¶87 Even if, as the court today concludes, the circuit court below erred in its assessment of the validity of the subpoena of Brown, Wilson failed to object to that error. Under well-established precedent, Wilson therefore forfeited the right to direct review of the alleged error and this court will only inquire into whether Wilson's counsel was constitutionally ineffective in neglecting to challenge the circuit court's ruling on the subpoena. See, e.g., Erickson, 227 Wis. 2d at 765-67.

¶88 Unfortunately, I must dissent because the court deviates from this "normal procedure in criminal cases," analyzing Wilson's claim on the merits without adequate justification. Id. I would adhere to precedent and analyze whether Wilson received the effective assistance of counsel. I conclude that Wilson's ineffective assistance of counsel claim fails because he has not demonstrated that he was prejudiced by his counsel's performance. Suppression would have occurred with or without Brown's testimony, and the decision of the court of appeals should be affirmed. Accordingly, I respectfully dissent.

¶89 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this opinion.

16